[Civil No. 2718. Filed November 13, 1928.]

[271 Pac. 720.]

HARRY R. BATTERTON, OSCAR C. COLE, STEVE ROEMER, J. G. COMPTON, FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Corporation, and NATIONAL SURETY COMPANY, a Corporation, Appellants, v. PIMA COUNTY, a Municipal Corporation, Appellee.

Messrs. Kingan & Darnell, Mr. John L. Van Buskirk, Mrs. Dorothy Sargent, Mr. J. L. B. Alexander, Mr. Robert McMurchie and Messrs. Stockton & Perry, for Appellants.

Mr. Louis R. Kempf, County Attorney, and Mr. Milton M. Cohan, Assistant County Attorney (Messrs. Curley & Pattee, of Counsel), for Appellee.

LOCKWOOD, J.—The Pima county courthouse was erected in the year 1882, when the population of that county was only about twenty per cent of what

it is now. As a natural result of the passage of years and the growth of population the county business has greatly outgrown the accommodations provided, and the building itself has deteriorated to such an extent that it is and has been for years universally admitted that it was only a question of time as to when it would be imperative that a larger and better courthouse and jail be erected.

The present courthouse is situated on the south half of block 192 in the city of Tucson, and, some years ago, realizing the impending necessity for a new building, and that the land owned at that time would be inadequate for the required structure, the then board of supervisors purchased a strip of ground in the same block immediately north of the property owned by the county. In 1926 Steve Roemer, Oscar C. Cole and J. G. Compton, hereinafter called the supervisors, composed the board of supervisors of Pima county. On June 7th of that year one R. G. Brady, a realtor of Tuscon, appeared before the board and submitted in writing an offer to sell the county all that part of block 192 not then owned by it for $58,000, some $7,000 to be paid by the assumption of various mortgages and the balance in cash. This property belonged to a number of persons, from all of whom Brady had secured options or contracts of purchase. In the offer Brady called attention to the impending need for a new courthouse and jail, and the importance of securing the balance of block 192 for that purpose before the realty values were raised. The supervisors, having considered the matter, appointed appraisers in conformity with the statute governing the acquiring of land for jail purposes, and also made inquiries of various prominent citizens as to the advisibality of the purchase. The appraisers fixed the value of the property at $60,000, and the supervisors on June 11th accepted Brady's

offer, a warrant was drawn for the purchase price, deeds taken from the different persons owning the property and recorded, and the transaction concluded.

On the 1st of January, 1927, a new board of supervisors took office. There had been considerable criticism in Tucson of the purchase above set forth, and the new board caused this action to be commenced in the superior court. Pima county in its official capacity was plaintiff, and there were some twenty-one defendants, who may be divided into several groups. The first group consists of the three supervisors hereinbefore named. The second group was composed of the original owners of the property, whom we shall hereafter call the owners. The third group was composed of the sureties on the bonds of the supervisors and their clerk, whom we shall hereafter call the sureties. The fourth group consisted of Harry R. Batterton, the clerk of the board of supervisors during the transaction involved herein, Richard G. Brady, the realtor who negotiated the deal, Frank B. Lopez, who was instrumental in securing the various options and contracts of purchase from the owners, and Ben B. Mathews and Ralph W. Bilby, who, it is claimed by plaintiff, were the attorneys for Brady, Lopez and Batterton in the transactions. We shall hereafter call this group the dealers. There were three other parties, but we need not consider them on this appeal.

After setting up the necessary formal matters and the ownership of the property involved, the complaint proceeds as follows:

"That, as plaintiff is informed and believes and upon such information and belief alleges, heretofore and just prior to the 7th day of June, 1926, defendants Richard G. Brady, Frank B. Lopez, Ben B. Mathews, Ralph W. Bilby, Oscar C. Cole, Steve Roemer, J. G. Compton and Berniece Davis conspired, combined, confederated and agreed together, and with

defendant Harry R. Batterton, to purchase and cause to be purchased by and on behalf of the plaintiff, and in violation of the laws of the State of Arizona, all that portion of Block 192 of the City of Tucson, Pima County, Arizona, not heretofore owned by plaintiff, and being what is known and described as Lots 1, 2, 6, 7, 8 and 9 of said Block 192, and at a price far in excess of the true and real value of such lots, and that as a result of such purchase, some of said defendants made and received out of the purchase price paid by plaintiff for such lots, a large profit, the exact amount and manner of distribution of which is unknown to plaintiff, but as plaintiff is informed and believes, and upon such information and belief alleges, such amount was in excess of Seventeen Thousand Dollars ($17,000.00). . . .

"That the said defendants Oscar C. Cole, Steve Roemer and J. G. Compton, then acting as such members of, and comprising the said Board of Supervisors, thereupon caused an entry to be spread upon the Minutes of said Board of Supervisors for June 11th, 1926, accepting the offer of defendant Brady, which said minute entry was in words and figures as follows, to-wit:

" 'R. G. Brady appeared before the Board in behalf of the proposition he submitted in writing on June 7, 1926, for the purchase by the Board of that portion of Block 192 not now owned by the County of Pima, and the report of the Board of Appraisers having been filed prior thereto, upon motion by Roemer, seconded by Cole, all members voting "yes," the offer of said R. G. Brady was accepted, the Chairman was authorized to sign an acceptance for the Board of Supervisors and the Clerk was instructed to place the money in escrow at the Tucson Realty and Trust Company, and to proceed to procure the deeds and title to the above property.' . . .

"That thereafter, and at a meeting of the said Board of Supervisors held on December 31st, 1926, the said defendants, Oscar C. Cole, Steve Roemer and J. G. Compton, then acting as such members of and comprising the said Board of Supervisors of Pima County, caused an entry to be spread upon the

Minutes of said Board of Supervisors, in words and figures as follows, to-wit:

" 'Upon motion duly made, seconded and unanimously carried, it was ordered that the following paragraph be entered in the Minutes of the Board as having been inadvertently omitted from the minutes of the meeting of June 11th, 1926:

" 'R. G. Brady appeared before the Board on behalf of the proposition submitted in writing on June 7, 1926, for the purchase by the Board of that portion of Block 192 in the City of Tucson, not now owned by the County of Pima, and the Board, finding it was necessary for the use of the county prison, and appraisers having been appointed by the Board, and appraisement having been made, upon motion of Roemer, seconded by Cole, and all members voting "Yes," the offer of the said R. G. Brady was accepted, and the Chairman was authorized to sign an acceptance for the Board of Supervisors and the Clerk was instructed to place the money in escrow at the Tucson Realty & Trust Company, and to proceed to secure the deeds and titles to the above property.'

"That the said portion of Block 192 heretofore referred to as having been purchased for and on behalf of plaintiff was not, and is not, nor was, or is, any portion thereof necessary for the use of the county prison, all of which was well known to the said members of said Board of Supervisors at all the times herein mentioned, and, as plaintiff is informed and believes, and upon such information and belief alleges, the said property was not purchased for the use of the county prison, nor for any other use or purpose for which said Board of Supervisors was authorized by law to purchase real estate for or on behalf of plaintiff, and that said minute entry of December 31st, 1926, was a mere subterfuge and pretense caused by the said defendants Oscar C. Cole, Steve Roemer and J. G. Compton to be entered for the purpose only of appearing to comply with legal requirements.

"That neither the purchase of said real estate, nor any part thereof, nor the expenditure made therefor, were included in any estimate or budget adopted by the said Board of Supervisors as required by law,

and as plaintiff is informed and believes and upon such information and belief alleges, said warrant therefor was drawn upon and such expenditure for said real estate was made from a special fund of this plaintiff which was not available for the purchase of real estate, and such expenditure was in violation of law, and void.

"Plaintiff is informed and believes, and upon such information and belief alleges, that defendants Richard G. Brady, Harry R. Batterton, Frank B. Lopez and Ben B. Mathews were each parties to the contract under which the said property was purchased for and on behalf of plaintiff, and received a profit from the proceeds thereof, the exact amount of which, and the manner of division of which plaintiff is not informed, but plaintiff is informed and believes, and upon such information and belief alleges, that such profit exceeded the sum of Seventeen Thousand Dollars ($17,000.00)."

The transfer of the property and payments of the money to the owners and dealers was then set forth, and the prayer for judgment against the supervisors was for the amount of money paid in cash for the land with twenty per cent added thereto; the prayer against the owners was that the deeds be canceled and that plaintiff recover the money actually paid to them for the property by it, with twenty per cent added thereto; the prayer against the surety companies was for the amount of their respective bonds with interest; and the prayer against the other defendants was for that portion of the amount paid out by the county which was received by each of them with twenty per cent added thereto.

The case was tried before the court sitting with a jury. After the evidence had been presented, the court directed the jury to return a verdict in favor of the owners of the property and defendants Davis, Floy, Batterton, and the Consolidated National Bank, and the case was submitted to the jury as to the supervisors and the other parties. A verdict was

returned in favor of the defendants, Brady, Lopez, Mathews and Bilby, and against the supervisors and Batterton in the sum of $19,050, plus twenty per cent thereon, no verdict being rendered either for or against the sureties. The court entered a judgment against the supervisors and Batterton in accordance with the verdict, and against the sureties for the full amount of their respective bonds. From the judgment the supervisors, the sureties and Batterton have appealed.

There are some fifteen specific assignments of error, but we will discuss the case from the standpoint of the fundamental questions of law involved. Members of boards of supervisors as such are financially responsible to the county for their official acts, in at least three different forms of action, two based on specific statutes and the third on the common law. The first case is where they have paid out county money with no authority of law therefor. This is covered by paragraph 2442, Revised Statutes of Arizona of 1913, Civil Code, which reads in part as follows:

"2242. Whenever any board of supervisors shall, *without authority of law,* order any money paid out of the county treasury for salary, fees, or for any other purpose, such supervisors and the party or parties in whose favor such order shall have been made, shall be responsible for all such sums of money and twenty per cent additional thereon, to be recovered as follows: . . . " (Italics ours.)

We have construed this paragraph in the cases of *Avery* v. *Pima County,* 7 Ariz. 26, 60 Pac. 702, and *Webster* v. *Parks,* 17 Ariz. 383, 153 Pac. 455.

In the latter case we said:

"Under the express terms of this statute, the fact that the board may have acted in a judicial manner, or that its members may have been honest and conscientious in their belief of their right to pay out the

sums of money charged, cannot in the least affect their liability for money paid out 'without authority of law.' If the members of the board would avoid personal responsibility for salary, fees or other sums of money paid out by them, they must ascertain if such payments are *for a purpose authorized by some statute or law of the state.* Good faith and honesty of purpose on their part are no defense to a lawsuit to recover moneys paid out without the law's sanction.'' (Italics ours.)

*A fortiori,* bad faith on the part of the supervisors, or a conspiracy, can add nothing to a suit under this section. The sole question is whether or not the purpose for which the money was paid out was one authorized by the statute. If it was, no suit can be maintained under paragraph 2442, *supra.* On the other hand, even though the purpose for which county funds are paid out is one authorized by law, it may be that a situation arises where supervisors fraudulently and corruptly order the payment with a view of some illicit profit to be made either by themselves or by others. In such a case an entirely different rule governs and fixes the remedy. It is found in paragraph 2480, Revised Statutes of Arizona of 1913, Civil Code, which reads in part as follows:

''2480. Any supervisor who . . . fraudulently or corruptly performs any duty imposed upon him, . . . in addition to the penalty provided in the penal code shall forfeit to the county five hundred dollars for every such act, to be recovered on his official bond, and is further liable on his official bond to any person injured thereby *for all damages sustained.*'' (Italics ours.)

The third alternative is the common-law action for conspiracy to defraud, governed by the usual rules applicable to such a case.

Appellees in their brief have stated:

''Plaintiff seeks to have returned to the County Treasury the money wrongfully paid out, plus the

twenty per cent. provided for by paragraph 2442, Revised Statutes 1913, Civil Code,''

—and the complaint bears no other construction. It is not a suit by Pima county under paragraph 2480, *supra,* to recover damages sustained by reason of the fraudulent and corrupt performance of an act in itself legal, nor one for a common-law conspiracy to defraud, but one to recover the amount paid out for an absolutely unauthorized purpose, plus a penalty fixed by statute, regardless of whether the motives of the participants in such act were good, bad, or indifferent.

The first question for our decision, then, is as to whether the payment of the money in question was for a purpose authorized by law. It is immaterial in an action based on paragraph 2442, *supra*, whether there was a conspiracy to do the act, or whether it was done fraudulently or corruptly, or whether any profit was made by outsiders, or any loss sustained by Pima county. The sole and only question is, Was the payment for a lawful purpose? If it was not, then the supervisors are liable for the full amount they ordered paid out—in this case, some $51,000—and each person who received any portion of said payment, no matter how honestly he may have acted, is liable for the amount he received in each case, plus a penalty of twenty per cent, and the property received by the county must be returned to the original owners.

The supervisors attempted to justify their action on the theory that the property in question was purchased to build a county jail thereon. Subdivision 8, par. 2418, Revised Statutes of Arizona of 1913, Civil Code, reads as follows:

''2418. The board of supervisors, in their respective counties, have jurisdiction and power, under such limitations and restrictions, as are prescribed by law: . . .

"(8) To purchase, receive by donation, or lease any real or personal property necessary for the use of the county prison, take care of, manage and control the same, but no purchase of real property must be made unless the value of the same has been previously estimated by three disinterested citizens of the county, appointed by the board for that purpose, and no more than the appraised value must be paid therefor."

It appears therefrom that a purchase for this purpose was fully within the jurisdiction of the board. It also appears from the record that the value of the property had been previously estimated by three citizens of the county who were appointed for that purpose, and that the appraised value thereof was some $2,000 more than the amount paid by the county. This on its face shows jurisdiction in the board to make the purchase. It is of course true that if the property was not purchased in good faith for prison purposes, and if the appraisement was not a *bona fide* one, but a mere subterfuge, the act would be unlawful. This, however, is a matter to be determined by the jury under proper instructions from the court. If the jury should find that it was the actual intention of the supervisors to purchase the property in question for future use as a site for a county jail, and that a *bona fide* appraisement was made in the manner provided by law, it would be immaterial as to whether a profit were made upon the transaction by the owners or by the dealers; the sale would nevertheless be a valid one, and no liability under paragraph 2442, *supra*, could rest upon the supervisors, even though they might have been fully cognizant of the fact that a large pfofit was being made by someone.

It is urged by plaintiff, however, that even though the purchase was made for prison purposes, and even though the appraisement was *bona fide*, that nevertheless under the provisions of paragraph 2446, Revised

Statutes of Arizona of 1913, Civil Code, the purchase was "without authority of law" in the meaning of paragraph 2442, *supra*. This paragraph reads as follows:

"2446. No member of the board or the clerk of the board must be interested directly or indirectly, in any property purchased for the use of the county, nor in any purchase or sale of property belonging to the county, nor in any contract made by the board or other person on behalf of the county for the erection of public buildings, the opening or improvement of roads, or the building of bridges, or for other purposes."

And it is claimed that Batterton, the clerk of the board, was interested in the property sold. Even if this be true, we think it does not bring the purchase within the terms of paragraph 2442. The effect of a provision almost identical with the latter paragraph was discussed by the Supreme Court of Utah in *Salt Lake County* v. *Clinton*, 39 Utah 462, 117 Pac. 1075. Therein the court said:

"The purposes for which the county commissioners may appropriate and direct the payment of money out of the county revenues are designated by law, and when appropriated and ordered paid for one or more of the purposes so designated such appropriation and order is not without authority of law, though made erroneously and in an irregular manner." "It is for money paid out by order of the Board for some purpose not authorized by law—that is, *paid out for a purpose which the law does not sanction under any circumstances*—that the members of the board are personally liable." (Italics ours.)

If we were to hold that interest on the part of the clerk or one of the supervisors in property purchased by the county made a purchase of such property to become "for a purpose which the law does not sanction under any circumstances," a purchase could be made in good faith by the majority of the board, for

a purpose fully authorized by law, of property well worth the money, and, because of some hidden equity unknown to them, the innocent members would incur the heavy liability set forth in paragraph 2442, *supra*. Such a rule would be so harsh that only a positive declaration by the legislature that a violation of paragraph 2446, *supra*, brought the purchase within the provisions of paragraph 2442 could make us so hold. If as a matter of fact the clerk or any or all of the members of the board are interested in property purchased for the county in violation of paragraph 2446, an ample remedy is provided therefor, but it is not that set forth in paragraph 2442, but rather that in paragraph 2480, *supra*, if the interested supervisors only are sued, or, if the clerk is made a party, the common-law action of fraud.

Nor does the fact that the purchase of the ground was not included in the budget for the current year make the transaction one "which the law does not sanction under any circumstances." Paragraph 4842, 1913 Civil Code, as amended by chapter 52, Session Laws of 1921, reads as follows:

"4842. It shall be the duty of boards of supervisors, city and town councils, or other governing bodies of incorporated cities and towns, to meet one week previous to the day on which they levy taxes, and at the time and place designated in said notice, when and where any taxpayer who may appear shall be heard in favor of or against any proposed expenditure or proposed tax levies. When such hearings shall have been concluded, such board of supervisors, city, or town, council, or other governing body of incorporated cities and towns, shall adopt the estimate as finally determined upon, and which estimate shall become and be adopted, and no expenditure shall be made for a purpose not included in such budget, and no debt, obligation, or liability shall be incurred or created in any year in excess of the amounts specified therein as an amount proposed and finally adopted for each purpose therein named; nor beyond

the amounts therein proposed and adopted to be raised by taxation, except when the other sources of revenue have been and are first received by the county, town, or city, as a means of liquidating such extra obligations and liabilities.''

By its terms, where a county has funds actually on hand at the time the budget is adopted, not the proceeds of current taxes proposed by the budget, it is not prohibited from incurring extra obligations and liabilities not set forth in the budget to the extent of such funds, if such obligations are otherwise authorized by law.

The money used to buy the land in question was not the proceeds of current taxes, but a special fund received from the state of Arizona in repayment of certain bonds theretofore issued by Pima county. It was not governed by the terms of paragraph 4842, *supra,* and its use by the supervisors was not illegal, because the item was not included in the budget.

We conclude, therefore, that on the pleadings and the theory of the action as stated by counsel for plaintiff in their brief, the case should have been submitted to the jury under proper instructions on the issue of whether or not the supervisors did actually purchase the property in question for county jail purposes, after a *bona fide* appraisement. If the purchase was so made, no judgment could be rendered against anyone under paragraph 2442. If, on the other hand, the purchase was not actually made for jail purposes, or the appraisement was not *bona fide,* then the judgment should have been against the supervisors for the full amount of cash paid out, against the owners and dealers for the amount of cash respectively received by them out of the $51,000, in each case plus the twenty per cent penalty, against the sureties for the amount of their bond in accordance with their liability thereon, and for a return of the property to the owners. Without going into

particulars it is evident from the whole record and the verdicts returned that the case was not submitted to the jury on instructions which would present these issues properly.

In the briefs and on the oral argument it was urged somewhat strenuously that there was evidence of a conspiracy on the part of somebody to defraud the county of a considerable sum of money, and that such reprehensible conduct should be penalized. Counsel may not, however, bring an action based on one statute, and sustain a verdict which can be justified only on an entirely different one, on the ground that somebody has made money out of Pima county illegally, and that on general principles some person, not necessarily the one who has made the money, should pay therefor. The pleadings, the evidence, and the judgment must be consistent and harmonious, and in this case they are anything but that. It follows that the judgment must be reversed and the cause remanded for a new trial.

In order to clarify the issues and avoid, if possible, reversible error on the new trial, we state the general principles of law as follows: In case the purpose of the purchase was illegal, applying to the situation disclosed by the record, the supervisors and all those receiving any of the money illegally paid out are liable for the amount paid or received, respectively, plus a twenty per cent penalty, the sureties are liable for the judgments against their principals to the extent of their bonds, and the property must be returned to the owners, subject to a lien thereon for the amount of judgment against such owners. If the purpose of the purchase was a legal one, but the supervisors acted fraudulently and corruptly in the transaction, then an action could be maintained against them and their bondsmen alone, under paragraph 2480, *supra,* the verdict in such case being for the actual damages to the county and the penalty as fixed by that para-

graph. If a general conspiracy existed between the supervisors and any other parties to defraud the county of any sum, the ordinary action of fraud would lie against all of the participants in such conspiracy, and the verdict and judgment would follow the usual rule of such cases. The proper authorities of Pima county were empowered to choose the action they thought justified by the facts as they exist, but they could not bring one action and sustain a verdict rendered therein which was justifiable only on an entirely different theory. We express no opinion as to any defense which may now be made to the different methods of procedure set forth above, but merely state the possible alternatives which Pima county had at the bringing of the original suit.

For the foregoing reasons, the judgment of the superior court of Pima county is reversed and the cause remanded, with instructions to grant a new trial in accordance with the views expressed herein.

ROSS, C. J., and McALISTER, J., concur.