[Civil No. 3640. Filed February 3, 1936.]

[54 Pac. (2d) 258.]

AMERICAN–LA FRANCE AND FOAMITE COR-PORATION (PACIFIC), a Corporation, Appellant, v. CITY OF PHOENIX, a Municipal Corporation, and THOMAS M. SULLIVAN, Its City Manager, Appellees.

Messrs. Marks & Marks, for Appellant.

Mr. Frank H. Lyman, for Appellee City of Phoenix.

Mr. H. S. McCluskey, for Appellee Thomas M. Sullivan.

LOCKWOOD, C. J.—This is an appeal by American-La France and Foamite Corporation (Pacific), hereinafter called plaintiff, from a judgment in favor of the city of Phoenix, a municipal corporation, hereinafter called defendant. The case was tried to the court sitting without a jury upon the pleadings and an agreed statement of facts. These facts, so far as they are material for a decision in this case, may be stated as follows:

The defendant is a so-called "home rule" city, having adopted a charter under the provisions of article 13, section 2, of the Constitution. During the spring of 1933, its proper officers prepared and adopted a budget for the fiscal year beginning July

1, 1933, in which was included the sum of $5,950 for the purchase of fire equipment for the use of the city. At that time there were no funds in the city treasury available for the purchase of such items. During the early fall of 1933, defendant desired to purchase two fire engines. It therefore caused a notice to bidders to be published, and, in response to said notice, plaintiff submitted a proposal. After investigation, the city commission approved of the purchase of the two engines from plaintiff, and on October 25, 1933, defendant's manager signed a written contract with plaintiff, the material portions of which are as follows:

"Lease contract of American-La France and Foamite Corporation (Pacific). . . .

"Witnesseth: That the party of the first part . . . does hereby agree to lease, and the party of the second part does hereby agree to hire the following property to be manufactured by the party of the first part, viz:

"Two (2) Standard American LaFrance 'Metropolitan' 12–Cylinder 1,000-Gallon Pumping and Hose Cars with 80 Gallon Water Tank (one with rotary gear pump and one with centrifugal pump). . . .

"The party of the second part, in consideration of the said party of the first part leasing said property as hereinbefore agreed, does hereby covenant and agree with said party of the first part, as follows, to-wit: . . .

"Third: That the party of the second part will pay in advance in cash as rental to the party of the first part for the use of said apparatus the sum of Twenty Nine Thousand, One Hundred Sixty & 00/100 Dollars ($29,160.00) in the following manner, to-wit:

"As per 'Schedule of Payments' on the reverse hereof which is hereby made a part of this lease contract.

"Said payments to the party of the first part to be made out of funds legally at the disposal of the party of the second part, created by lawful device for the

current fiscal years in which said payments are to be made.

"Schedule of Payments.

"Nine Thousand & 00/100 Dollars ($9,000.00) within thirty days from the date of acceptance of said apparatus.

"Seven Thousand Eighty & 00/100 Dollars ($7,080.00) not later than twelve months from the date of acceptance of said apparatus.

"Six Thousand Seven Hundred Twenty & 00/100 Dollars ($6,720.00) not later than twenty-four months from the date of acceptance of said apparatus.

"Six Thousand Three Hundred Sixty & 00/100 Dollars ($6,360.00) not later than thirty-six months from date of acceptance of said apparatus.

"Fourth: That if default be made in the payment of the first or any of the above mentioned rental payments or other payments, then the said party of the first part, its servants, agents, attorneys or representatives may enter upon the premises and into the building where said apparatus may be and take possession of the said apparatus and appurtenances and property and take away, repossess and enjoy the same as though these presents were not made. And that the said party of the first part shall have the right to retain any and all rental payments made to it by the said party of the second part prior to the time of such default, and the said party of the second part shall be and remain liable to the party of the first part for any and all rental or other payments payable under the provisions hereof and unpaid at the time of said retaking of the apparatus, including such rental payments so defaulted. . . .

"Seventh: That if said apparatus and appurtenances are manufactured in accordance with the specifications hereto attached, the party of the second part will accept said apparatus and appurtenances at once after delivery and test. . . .

"The party of the first part hereby . . . agrees to and with the party of the second part that if said party of the second part shall well and truly keep the covenants herein made . . . then the party of the first part will, upon receipt of one dollar in addition to the rent money aforesaid, make, execute and de-

liver to the party of the second part a good and sufficient Bill of Sale for the said apparatus and appurtenances, . . .

"The within lease is hereby accepted and approved. Los Angeles, Calif., October 29, 1933.

"AMERICAN LAFRANCE AND FOAMITE CORPORATION (PACIFIC)

" [Seal.] ·

"By T. B. DOHERTY, President."

Thereafter, plaintiff forwarded to Phoenix two fire engines in accordance with the contract above set forth. Defendant for various reasons refused to accept them, and about the 1st of April, 1934, two other engines were offered it by plaintiff in lieu of the first two tendered. The city commission thereupon instructed the city manager to accept these engines upon satisfying himself that they were in accordance with the specifications agreed upon, and he reported that they were substantially so, but had not been delivered within the time specified, and that because of certain legal objections to the contract he would not accept them. Thereupon the city commission adopted the following ordinance:

"Section 1. That the contract entered into by and between the City of Phoenix, and the American LaFrance and Foamite Corporation, dated October 25, 1933, be and the same is hereby ratified and approved with the same force and effect as though executed pursuant to an ordinance authorizing the same.

"Section 2. That all acts of the City Manager done in connection with said aforementioned contract are hereby ratified and that wherever said City Manager may have performed any act in connection therewith which was in excess of his powers and duties and which should have been performed by the Commission of the City of Phoenix, said acts are hereby accepted by the Commission of the City of Phoenix and declared to have been its acts, with the same force and effect as though actually performed by said Commission of the City of Phoenix. . . . "

It appearing, however, that litigation in regard to the matter was about to be instituted, upon May 1st the commission ordered that the engines be not accepted until the conclusion of such litigation. The matter came before the superior court of Maricopa county, and it made findings of fact setting up practically what we have just stated, and, in addition thereto, other matters which we shall refer to from time to time as it becomes necessary in the determination of this case, and rendered judgment for defendant.

 There are many questions of law presented by the appeal, but the one which we consider determinative of the issues and which, therefore, will be the only one discussed by us, is whether or not the city of Phoenix had the power to enter into the contract above recited, for the reason that it violated the provisions of sections 3097 and 3098, Revised Code 1928, commonly referred to as the "budget law." These sections read as follows:

"§ 3097. County and city officer to make annual statement and estimate; publication and notice. The board of supervisors of each county, and the governing body of each incorporated city or town, not less than thirty days prior to the date on which the regular annual tax levy is made, shall prepare a full and complete statement of the financial affairs of the fiscal year last past; and an estimate of the different amounts which may be required to meet the public expense for the ensuing year. . . . The estimate shall contain a statement of the amount of money required for each item of expenditure necessary for county, city or town purposes. . . . The estimate shall be entered upon the minutes of the governing body and shall be fully itemized, . . . and a full and complete disclosure and statement of the contemplated expenditures for the ensuing year. . . . The estimates together with a notice that such board of supervisors, or governing body, will meet for the purpose of

making tax levies, as set forth in said estimates, naming the time and place of holding such meeting, shall be published for at least two consecutive weeks following the tentative adoption of such estimates.''

''§ 3098. Hearing on estimates and adoption thereof. The boards of supervisors and governing bodies of incorporated cities and towns shall meet one week previous to the day on which they levy taxes, as designated in said notice, and any taxpayer may appear and be heard in favor of or against any proposed expenditure or proposed tax levies. When such hearing has been concluded, the estimate as finally determined upon, shall be adopted, and no expenditure shall be made for a purpose not included in such budget, and no debt, obligation, or liability shall be incurred or created in any year in excess of the amounts specified therein as finally adopted for each purpose therein named; nor beyond the amounts therein proposed to be raised by taxation, except when the other sources of revenue have been and are first received as a means of liquidating such extra obligations and liabilities.''

We have considered the purpose and effect of the budget law in several cases. The leading one is *Bank of Lowell* v. *Cox*, 35 Ariz. 403, 279 Pac. 257, 260, involving an alleged indebtedness of a county. Therein we set forth the evils of the situation existing before the adoption of the law, and stated its fundamental purposes to be as follows:

''To put county affairs on a cash basis and then to maintain them so by prohibiting the incurring of any indebtedness in any fiscal year, unless funds had been first provided to meet it.''

We then set forth the duties of the governing body of a county under the budget law, as follows:

''The supervisors must first prepare an estimate of all expenses of every nature which must be met by the county during the ensuing year, and if any proposed expenditure is not shown in the budget, no liability for that purpose can even be incurred, for

'no debt, obligation, or liability shall be incurred or created in any year in excess of the amounts specified therein as an amount proposed and finally adopted for each purpose therein named'; the only exceptions being those authorized by paragraph 4842–A, *supra* [section 3099, Rev. Code 1928], and obligations to be met with funds other than current taxes and already on hand. But while certain obligations may be incurred under paragraph 4842–A, *supra,* without being first included in the current year's budget, even these, before they can be paid from the next year's taxes, must be budgeted, for the budget must contain 'the items and amounts of every special levy by law provided to be assessed, levied and collected,' and since when liabilities are incurred and warrants drawn under an order of the tax commission the 'tax levy of the next fiscal year . . . shall include a separate item to cover the aggregate of all such warrants,' the money raised to pay those liabilities is clearly a 'special levy by law provided.' *Arizona Eastern R. Co.* v. *Graham County,* 19 Ariz. 320, 170 Pac. 792.

"We hold, therefore, that boards of supervisors are without jurisdiction to authorize the actual expenditure of any county money for any purpose whatever, unless the expenditure be provided for in the budget of the current year, or the money be already on hand from some source other than the taxes of such year. Paragraph 4842, *supra; Batterton* v. *Pima County,* 34 Ariz. 347, 271 Pac. 720.

"Nor have they jurisdiction to incur any indebtedness whatsoever except (a) as shown in the budget, (b) as authorized by the tax commission as an emergency, to be incurred only during the fiscal year the order of the commission is made, and (c) as covered by funds already on hand and produced by other means than the current year's taxes. *Batterton* v. *Pima County, supra; LeFebvre* v. *Callaghan,* 33 Ariz. 197, 263 Pac. 589.''

And we have adhered to this principle in the cases of *Automatic R. M. Co.* v. *Pima County,* 36 Ariz. 367, 285 Pac. 1034, *Board of Supervisors* v. *Udall,* 38

Ariz. 497, 1 Pac. (2d) 343, and several others. By the express terms of the law it applies to all incorporated cities and towns to the same extent as it does to counties. If then the contract in question violated the budget law, it was void *ab initio*, and could not be validated by any act of defendant. It will be seen upon considering its terms that whether we call it, as it is denominated upon its face, a lease, or whether, as it is insisted by defendant, it is in reality a conditional sales contract, it does constitute a binding obligation upon defendant to pay to plaintiff the total sum of $29,160. This obligation, under the terms of the contract, could not be avoided by a surrender of the property before the expiration of the time set forth for the completion of the payments, for it recites that, even though there be a default in the payments and plaintiff repossesses itself of the engines, "the said party of the second part shall be and remain liable to the party of the first part for any and all rental or other payments payable under the provisions hereof and unpaid at the time of said retaking of the apparatus, including such rental payments so defaulted."

The budget for the city of Phoenix for the year in which the engines were bought provided only the sum of $5,950 for that purpose. Certainly a contract which created an indebtedness on the part of defendant for $29,160, regardless of when or how the payments were to be made, could not be justified under the amount budgeted for fire apparatus.

But it is contended by plaintiff that the record shows there were other funds on hand, not the proceeds of the taxes proposed by the budget, and that such funds may be used for any legitimate purpose, notwithstanding that the item for which they are used was not included in the budget. We have had

a similar contention before us in the case of *Batterton* v. *Pima County,* 34 Ariz. 347, 271 Pac. 720, 724. Therein we said, referring to the budget law:

"By its terms, where a county has funds actually on hand *at the time the budget is adopted,* not the proceeds of current taxes proposed by the budget, it is not prohibited from incurring extra obligations and liabilities not set forth in the budget to the extent of such funds, if such obligations are otherwise authorized by law." (Italics ours.)

If, therefore, it does appear from the record that the city of Phoenix, at the time the budget for 1933–1934 was adopted, had on hand funds sufficient to pay for the fire apparatus in question, it would not be a violation of the budget law to use such funds for that purpose, for certainly the purchase of fire apparatus for the use of defendant was a purpose authorized by law. Plaintiff, in order to bring itself within this exception to the budget law, calls our attention to the finding of the court that, at the time the contract was entered into, the cash balance of the general fund of the city of Phoenix was $54,836.16, more than double the amount necessary to pay in full for the engines, and that on the 16th day of February, 1934, when the new engines were actually delivered, there was an even greater amount of cash balance in the general fund. Is this sufficient to show that at the time of the approval of the budget in June, 1933, the city had actually on hand funds available for the purchase of such apparatus? We think it entirely insufficient. There is nothing from which we could presume that a balance on hand on the 25th of October, 1933, and the 16th of February, 1934, even if it were not incumbered by other obligations of the defendant, was on hand and available in June, 1933, or that it was not the proceeds of current taxes

for the fiscal year 1933–1934. Further than that, the answer of defendant alleges:

"That at the purported date of said form of lease agreement, and at the time said lease agreement is alleged to have been entered into by said defendant, there was not available *for the purposes of said purchase* sufficient funds in the treasury of said defendant to meet the obligation alleged to have been contained in said purported contract.

"That the amount provided for by said defendant in its budget for the then current year was not sufficient to meet the requirements of said alleged and purported contract." (Italics ours.)

And this is not denied by any of the pleadings of plaintiff, nor contradicted by any of the evidence in the case. It is not sufficient to show in reply to the allegation that "there was not available for the purpose of said purchase sufficient funds in the treasury of defendant to meet the obligation" that there was a cash balance in the general fund of defendant several months later, for such cash balance might well have been composed of revenues collected for the current fiscal year or funds already obligated for other debts, and, if so, it was not available for the purposes of the purchase, except to the extent of the $5,950 budgeted therefor. A somewhat similar situation arose in *Board of Supervisors* v. *Udall, supra,* and we held that the allegations of the complaint therein, which were not denied by the defendant, were sufficient, in the absence of proof to the contrary or the denial thereof, to raise the presumption that there were no funds on hand legally available to pay the indebtedness incurred by the contract involved in that case. We hold, therefore, that since the contract involved herein created an indebtedness in favor of plaintiff and against defendant greatly in excess of the amount budgeted for such purpose by defendant for the fiscal year 1933–1934, and since it does not

appear that there was available for such purposes at the time the budget was made funds not covered by the budget law, the contract was void *ab initio,* and could not be ratified or approved in any manner by defendant or its officers.

Plaintiff urges that, admitting for the sake of argument that all this would be true if defendant were one of the counties of the state or a municipal corporation organized under the general law, since it is one of the home rule cities organized under section 2 of article 13 of the Constitution, it is not bound by the limitations of the state budget law, but only by those set forth in its own charter.

We have had under consideration in several previous cases the question of when a general state law applies to home rule cities. In the case of *Clayton* v. *State,* 38 Ariz. 135, 297 Pac. 1037, 38 Ariz. 466, 300 Pac. 1010, the question arose as to whether the State Highway Code applied to the streets of the home rule cities, and therein we said:

"If, however, a city by-law is not about a matter of municipal concern but a matter of general statewide concern, it would not be a 'rightful subject' of legislation, as defined by the general grant of power in the charter. The police power inheres in the state and not in its municipalities. The latter are agencies of the state and exercise police and other powers only by grant given either directly or by necessary implication. We think the broad grant of powers contained in sections 1 and 2, chapter IV of the Charter, should be, and was intended to be, limited to by-laws concerning purely municipal affairs."

A motion for rehearing was presented, and, in ruling on it, we used the following language:

"Where the subject is one of local interest or concern, or where though not of local concern the charter or legislation confers on the city express power to legislate thereon, both jurisdictions may legislate

on the same subject. Where, however, the subject is of statewide concern, and the Legislature has appropriated the field and declared the rule, its declaration is binding throughout the state''

—and reaffirmed this principle in *Northeast Rapid Transit Co.* v. *City of Phoenix,* 41 Ariz. 71, 15 Pac. (2d) 951. Again in *State* v. *Jaastad,* 43 Ariz. 458, 32 Pac. (2d) 799, we had before us the question of whether the minimum wage law of the state bound the home rule cities, and a second time reaffirmed the principle of the Clayton case, *supra,* as applied to the minimum wage law.

We are of the opinion that the policy of ''pay as you go,'' laid down by the legislature in the budget law and applied by the express language of such law to all municipal corporations without exception, is of as great importance as a matter of general public policy as the regulation of speed upon the highways or the payment of a minimum wage to public employees, and the legislature having appropriated the entire field by a declaration of public policy broad enough in its language to include the home rule cities, the provisions of the state budget law apply to them with the same force and effect as to any of the other municipal corporations in the state.

There are many other questions presented and argued in the briefs, but, in view of our opinion upon this point, there is no necessity for our discussing them. Since the contract attempted to be entered into between defendant and plaintiff, and upon which this action is based, was absolutely beyond the power of defendant to make, no act on its part could breathe life into a thing stillborn in the beginning.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER and ROSS, JJ., concur.