[Civil No. 4090. Filed July 14, 1939.]

[92 Pac. (2d) 513.]

CITY OF PHOENIX, a Municipal Corporation, Appellant, v. R. F. KIDD, Appellee.

Mr. Hess Seaman, City Attorney, Mr. Wm. C. Fields and Mr. Eli Gorodezky, Assistant City Attorneys, for Appellant.

Mr. J. S. Wheeler, for Appellee.

LOCKWOOD, J.—R. F. Kidd, hereinafter called plaintiff, brought suit on behalf of himself and some thirty-five other persons who had assigned their claims to him for wages which he alleges is due to him and his assignors from the City of Phoenix, a municipal corporation, hereinafter called defendant. Judgment was rendered in favor of plaintiff in the superior court, and this appeal was taken.

The appeal involves a consideration of section 1350, Revised Code 1928, as amended by chapter 12, Regular Session 1933, commonly known as the Minimum Wage Law. The facts have been stipulated, and we

summarize them so far as material. Plaintiff and each and all of his assignors were engaged in either mechanical or manual labor on public works of the defendant on August 1, 1937, and thereafter during the period alleged in the complaint, all of them being within the classified civil service of defendant. After the city commission of defendant had adopted its budget for the fiscal year 1937–38, the state highway commission, acting under section 1350, *supra,* adopted a new minimum wage scale for employees engaged in mechanical or manual labor, effective as of August 1, 1937, which increased the minimum wage over what it had been at the time of the adoption of the budget aforesaid. Plaintiff and his assignors were paid wages at the rate established by the minimum wage scale as it existed at the time the budget was adopted during the period which they worked subsequent to August 1, 1937, and voluntarily continued in the employ of the defendant and accepted the wages as tendered to them by defendant, with full knowledge that the budget had been adopted on the basis of the prior wage scale.

The amount sought to be recovered by plaintiff correctly represents the difference between the wages actually paid to him and his assignors and the wages they would have received if they had been paid in accordance with the increased minimum wage scale adopted by the highway commission, as aforesaid, for the time they worked. The amount claimed is all in excess of the amount budgeted by defendant for labor of the class performed by the plaintiff and his assignors for the fiscal year 1937–38, or any other unobligated funds of defendant.

Defendant raises two propositions of law, which we shall consider as seems advisable, (a) employees of the City of Phoenix, within the classified civil service,

whose compensation is paid from funds appropriated in the budget of the city, are not subject to the minimum wage scale fixed by the highway commission, under the provisions of section 1350, *supra,* (b) the City of Phoenix is not permitted to exceed its annual budget for work of the class performed by plaintiff and his assignors, and to pay them the wages fixed by the highway commission would compel it to do so.

 So far as the first objection is concerned, we think it has no merit. We have held in the case of *State* v. *Jaastad,* 43 Ariz. 458, 32 Pac. (2d) 799, and *City of Phoenix* v. *Drinkwater,* 46 Ariz. 470, 52 Pac. (2d) 1175, that the self-governing cities of the state are subject to the provisions of any general law adopted as a matter of statewide policy, regardless of any special charter provisions, and that the Minimum Wage Law is one of that nature, so that it supersedes any provision of the charter or ordinance of the City of Phoenix which may be contrary thereto. We are of the opinion, however, that there is no conflict. While the employment and discharge of city employees, under the civil service ordinance, must be in strict conformity with the ordinance, we know of nothing therein which would compel the city to retain in the service any civil service employees when there are no funds available for their payment. A somewhat similar question recently arose in the case of *City of Phoenix* v. *Sittenfeld,* 53 Ariz. 240, 88 Pac. (2d) 83, and it appears therefrom that the city has the right, under the civil service ordinance, to lay off employees when there are not sufficient funds budgeted for their payment, with the proviso that they must be laid off in the order of their seniority. We think the same situation applied to the present case. If the city officials found that under the new minimum wage scale fixed by the highway commission there were not sufficient funds

budgeted to take care of their employees, they could have easily kept within the budget by laying off such employees in the order of their seniority until the force was reduced sufficiently to keep expenditures within the budget, or they might have requested the tax commission for permission to exceed the budget. Section 3099, Rev. Code 1928.

` The second question is whether the defendant is permitted to exceed its budget for the payment of plaintiff and his assignors. As we have indicated, it was not necessary for it to retain them in service after the funds budgeted for their payment were exhausted, but nevertheless it took that course, and we must determine whether the claim of plaintiff and his assignors for further payment for such services is void because of sections 3097–3099, Revised Code of 1928, commonly called the budget law.

We have held that the budget law applies to the so-called home rule cities in the same manner as it does to counties. *America-LaFrance etc. Corp.* v. *Phoenix,* 47 Ariz. 133, 54 Pac. (2d) 258. In the case of *Fullen* v. *Calhoun,* 39 Ariz. 40, 3 Pac. (2d) 786, 787, we had occasion to discuss at some length the class of expenditures to which this law applies and those to which it does not. We said:

"An examination of the provisions of the law pertaining to the making of annual budgets, sections 3097, 3098 and 3099, Revised Code of 1928, discloses that some of the items that enter into the budget are what may be designated as fixed items of expense, such as the interest and principal of any bonds of the county, the items and amounts of every special levy provided by law, the salaries of public officers, etc. Some of the expenses of maintaining the county government, although authorized, are not fixed in amount by any law, such as the county printing and advertising, necessary books and stationery, feeding of county prisoners, the care of the indigent sick, necessary water, wood, lights,

and like supplies for county institutions, insurance and repairs of county buildings and county roads, and for other purposes.

"Items of the first kind are fixed charges, made so by law, and all the board has to do is to calculate the amounts. They cannot, for instance, estimate the salary of the officials, or the interest or principal on bonds, or a special levy fixed by the Legislature. Their work on these items is merely clerical. As to items of the other kind, it is up to the board to fix the sums needed, according to the necessities of the case, and their estimates of such items cannot be exceeded by expenditures. In other words, the estimated expenses and expenditures are supposed to coincide, or at least the expenditures cannot exceed the estimates. *Bank of Lowell* v. *Cox,* 35 Ariz. 403, 279 Pac. 257.

"The evident purpose of the 'Budget Law' is to establish the plan of 'paying as you go'; also to allow the taxpayer an opportunity to object to any proposed expenditure, or the amount thereof, by the board of supervisors, when not specifically authorized and fixed by the Legislature. If the Legislature has named a county expense and fixed the sum or sums to be paid therefor, the members of the board of supervisors, as also the taxpayers, are bound thereby, and the board must to the best of its ability perform the ministerial duty of meeting such fixed expense in the annual budget. It is true section 3098, *supra,* provides that, when the hearing of taxpayers on the proposed budget has been concluded, the board of supervisors shall adopt such budget 'as finally determined upon . . . and no expenditure shall be made for a purpose not included in such budget, and no debt, obligation, or liability shall be incurred or created in any year in excess of the amounts specified therein as finally adopted for each purpose therein named. . . . '

"It will be noticed that the prohibition is against the board's incurring or creating any debt, obligation, or liability. It is not against the payment of debts, obligations, and liabilities created or incurred by the county or its agents in the manner and for the sums fixed by the Legislature itself. It seems clear that the prohibitions in the 'Budget Law' are directed at those

items of county expense which the board of supervisors, as the business and fiscal agents of the county, are authorized to incur through contracts, and not to those items that are fixed and definite charges by virtue of direct legislative act. . . .

"The superior courts are constitutional agencies of the state, exercising important and necessary powers of the sovereignty. The Constitution, section 6, article 6, affirmatively states:

" 'For the determination of civil causes and matters in which a jury demand has been entered, and for the trial of criminal causes, a trial jury shall be drawn and summoned from the body of the county at least three times a year.'

"This provision recognizes the jury as a necessary adjunct or part of the court for the trial of certain kinds of cases. The Legislature has provided the manner and time of making the jury lists and for the drawing of jurors. . . .

"The compensation of jurors is as much fixed as the salary of officers, the interest or principal of county bonds, or items or amounts of special levies. It is true no one can know beforehand the number of juror days or the amount of juror mileage there will be in any given fiscal year, it all depending upon the number of jury cases and the time consumed in their trial, and for that reason the items for jury fees and mileage cannot be definitely determined for the budget. The estimate of the board of supervisors entering the annual budget for this account at most can only approximate the expense. If the estimate as contained in the budget is inadequate to pay all the fees and mileage of jurors, the jurors nevertheless are entitled to warrants on the treasury of the county, to be paid out of sources of revenue other than property taxation, if available for that purpose; otherwise to be registered by the county treasurer as provided in section 867 of the Revised Code of 1928, and cared for out of the county's budget for the following fiscal year."

It appears, therefore, that all expenditures which are optioned with the counties and the municipalities, and are not required by the Constitution or a

legislative act to be made, are within the provisions of the budget law. There is no direction by the legislature that the functions in which plaintiff and his assignors performed labor should be carried on at all. That was left to the option of the municipalities, subject to the limitations of all general laws affecting such activities. Since this is true, it is plainly true that there was no legislative mandate that plaintiff and his assignors, or any other persons, should be employed to carry on those functions. On the contrary, it was expressly declared by the budget law that they should not be carried on so as to create any liability against the municipalities in excess of the amount previously budgeted for those purposes. Nor does the budget law distinguish between expenditures for labor and those for material. The one must conform to the law as well as the other. A contract for employment is no more exempt from the provisions of the law than is a contract for material. If the authorities of the municipalities are permitted to hire labor to any extent which they choose, regardless of whether they have budgeted therefor, the entire purpose and effect of the law could and would be defeated just as much as if they were permitted to contract for the purchase of equipment or materials in excess of the amount provided for that purpose. Nor may the person who furnishes either material or labor in excess of the amount budgeted therefor claim exemption from the provisions of the law by reason of the fact that he did not know the budget had been exceeded. We have held that all those who enter into any contractural relations with the cities and counties are bound at their peril to know whether such contract will cause the budget law to be violated, and if it does, the contract is void, and cannot be enforced. *Bank of Lowell* v. *Cox,* 35 Ariz. 403, 279 Pac. 257. It is unlikely that if it were

not for the Minimum Wage Law there would be even a pretense on the part of anyone that plaintiff and his assignors could recover from defendant any payment for services for labor rendered after the amount budgeted for that purpose had been exhausted. Unless, therefore, it appears that the Minimum Wage Law has changed the policy of the state as set forth in the budget law, plaintiff and his assignors indubitably cannot recover. Does that law make such a change? Its language is as follows:

*"Hours Of Labor On Public Work; Wages.* Eight hours, and no more, shall constitute a lawful day's work for all persons doing manual or mechanical labor employed by or on behalf of the state, or of any of its political subdivisions, except in an extraordinary emergency, in time of war, or for the protection of property or human life; in such cases the persons working to exceed eight hours each day shall be paid on the basis of eight hours constituting a day's work. Not less than the minimum per diem wages fixed by the state highway commission for manual or mechanical labor performed for said commission or for contractors performing work under contract with said commission, shall be paid to persons doing manual or mechanical labor so employed by or on behalf of the state or of any of its political subdivisions. Persons doing manual or mechanical labor employed by contractors or sub-contractors in the execution of any contract with the state, or with any of its political subdivisions, shall be deemed to be employed by or on behalf of the state, or of such political subdivision thereof."

The most careful and critical examination thereof will fail to discover any provision therein either requiring or even suggesting that the functions in which plaintiff and his assignors performed the work which they did perform for defendant should be carried on, much less they should be employed for that purpose. Nor does it intimate in any manner that contracts for labor of the class referred to in the law are

to be exempt from the limitations placed on all contracts by the budget law. It makes no reference, direct or indirect, to any of these matters. Its sole provisions are that certain hours, and no more, shall constitute a lawful day's work for the persons named therein who are employed by or for the public, and that when so employed they shall be paid a certain amount per diem. The only manner in which by any conceivable stretch of the imagination it might be urged that the Minimum Wage Law in any manner deals with the limitations imposed by the budget law is that we should read into it, in effect, ''and these wages shall be paid regardless of whether the contract of employment is legal or illegal, authorized or unauthorized by law.'' This would be legislation by the court in support of its economic theories of what the law should be and not a declaration of what the legislature has said plainly it is. The labor referred to in that law, for which the hours are limited and the wages are fixed, must necessarily be labor which is employed under the authority of the law, and not labor retained in violation of an express law, and which cannot by the terms of that law create any liability on the part of the employer. If an employer is expressly forbidden by law to employ labor under certain contingencies, how can an agent by violating that law bind the employer to pay for the labor?

There is no conflict between the budget law and the Minimum Wage Law, nor do we think there is the slightest indication that the legislature ever intended that the later law should affect the provisions of the former. The rule laid down by the two construed together, as it is our duty to construe them if it can be done, is that defendant was bound to pay its employees at the rate fixed by the Minimum Wage Law until such time as the amount budgeted by it for

such purpose was exhausted, but that when this occurred any contract of employment depending for its payment upon the amount budgeted was automatically terminated by operation of law and was beyond the power of the municipality to extend or ratify, and that any attempt at its so doing was void.

It may be urged that this will work a hardship and injustice upon those who have in good faith furnished labor for the municipalities. The same objection was urged for years when there was any suggestion that the power of the governing boards of the municipalities and the counties should be restricted so they could not incur unlimited indebtedness. It was to meet this very situation that the budget law was adopted, and if we now hold that since the adoption of the Minimum Wage Law laborers of the class described therein are not subject, so far as the length of time for which they may be legally employed, to the terms of the budget law, and that if they perform services for the municipalities in excess of what the amount budgeted therefor permits they can nevertheless recover for such excess, we are legislating instead of acting judicially.

 The record shows that plaintiff, his assignors and those in like circumstances were paid for services rendered by them the full gross amount budgeted by the city for services of that nature, and neither plaintiff, his assignors nor the city could apply the funds so paid and received at any rate but that fixed by the Minimum Wage Law. It makes no difference that either or both the city and its employees may have thought and intended the payments should be credited at a different rate. An act of the legislature cannot be thus ignored nor violated. The Minimum Wage Law fixed the rate at which the amount paid was credited, and when the gross amount budgeted

for these purposes, applied at that rate, was exhausted, all contracts of employment for such purposes were automatically terminated and no new contract could be made by either the city or the plaintiff, working separately or together, under the doctrine of waiver, estoppel or any other principle known to the law, so as to create a liability on the part of the city.

 The language of the budget law, Revised Code of 1928, section 3098, is explicit:

"No debt, obligation, or liability shall be incurred or created in any year in excess of the amounts specified therein as finally adopted for each purpose therein named."

It must not be overlooked that the budget law is not a rule adopted by the city itself for its own benefit, so that the city may waive it or be estopped by its conduct from asserting it. It is an act adopted by the legislature of the state, as a direct and positive limitation of action by the city, and this being the case, no act of the city, nor of any other person, acting either alone or in combination, knowingly or unknowingly, intentionally or unintentionally, can alter the limitation. When the amount budgeted is exhausted, no further obligation can be created, and if this be true, certainly no judgment may be rendered against the city.

 It is very true that it may be that a moral obligation exists upon the city to remunerate plaintiff and his assignors for work which they have performed without compensation, but only the legislature itself may waive the provisions of the budget law and authorize, much less direct, the city to meet that moral obligation by payment. This has been done in some cases. *Palmcroft Dev. Co.* v. *City of Phoenix,* 46 Ariz. 200, 49 Pac. (2d) 626, 103 A. L. R. 802; Id., 46 Ariz. 400, 51 Pac. (2d) 921, 103 A. L. R. 811. But this is a

matter for the discretion of the legislature, and cannot affect the present situation.

 As we have held in *State* v. *Angle, ante,* p. 13, 91 Pac. (2d) 705, just decided, we must determine cases of this kind on the law, regardless of what we may think of the moral equities involved. In that case, as it happened, the law was with the plaintiff; in this case it is not, but in both cases we must comply with the law as it is, and not as we might think it should be. We hold, therefore, that since the employment of plaintiff and his assignors was not required by any legislative enactment, and since their employment, after the amount budgeted for payment for their services was exhausted, was a violation of the terms of the budget law which rendered the contract of employment from that time on null and void, they may not recover.

For the foregoing reasons, the judgment of the superior court is reversed, and the case remanded with instructions to enter judgment for defendant.

ROSS, C. J., concurs.

McALISTER, J., Dissenting.—I am unable to concur in the conclusion reached by my colleagues and will state briefly why.

We have held consistently since the first decision under the Minimum Wage Law, *State* v. *Anklam,* 43 Ariz. 362, 31 Pac. (2d) 888, that the minimum per diem wage set by the highway commission for those performing manual or mechanical labor for the state or any of its political subdivisions must be paid from the day the commission fixes it. In fact, it has been pointed out several times that it is unlawful for the employee to work for less, and that section 7, chapter 12, Session Laws of 1933, goes so far as to make it a

criminal offense on the part of an officer having charge of employment, or any person acting under or for him, to pay less than the minimum. *State* v. *Anklam, supra; City of Glendale* v. *Dixon,* 51 Ariz. 86, 75 Pac. (2d) 42. And this is true whether the rate be that fixed originally or subsequently, because any order by the highway commission changing the per diem becomes automatically and immediately effective, though this provision of chapter 12 was amended by the fourteenth legislature in such a way as to require the highway commission to determine and publish the minimum fixed by it not later than April 15th of each odd numbered year, the purpose evidently being to prevent in the future a change in the wage rate during any fiscal period. Chapter 42, Session Laws of 1939. However, even though the minimum was raised by the commission after appellee and his assignors began working and the city's duty to pay them the increase each month thereby arose, they could nevertheless continue to work under the rate existing when they started without depriving themselves of the right to the increase, provided they initiated action therefor within the one-year limitation. *City of Phoenix* v. *Drinkwater,* 46 Ariz. 470, 52 Pac. (2d) 1175; *City of Glendale* v. *Coquat,* 46 Ariz. 478, 52 Pac. (2d) 1178, 102 A. L. R. 837. While it would have been unlawful for them to work for less than the minimum, it was not unlawful for them to accept the old rate and merely postpone claiming the increase to such time as they saw fit, provided they acted before it was barred by the one-year statute.

It is urged by the city, however, that the order of the highway commission, dated August 1, 1937, fixing a new minimum for the class of labor appellee and his assignors were performing, could not have been complied with by the city without producing a conflict

between the Minimum Wage Law and the budget law in that it would have caused the city to exceed the amount it budgeted July 20, 1937, and my colleagues uphold this contention, though they state that there would have been no conflict between the two laws if the Minimum Wage Law had been lived up to until the budget was exhausted. Their holding in effect is, that the city was bound to pay appellee and his assignors the wages fixed by the highway commission until the amount it had budgeted for the work they were doing was exhausted and that when this occurred the contract by which they were employed, being one depending for its fulfillment upon the amount budgeted, was automatically terminated by operation of law, and any attempt to extend or ratify it was void. In other words, it was the duty of the city to pay appellee and his assignors the per diem fixed by the highway commission on August 1, 1937, until the amount budgeted for the work they were doing was exhausted, in which event it would have been compelled to pursue one of these two courses: Either discharge appellee and his assignors or part of them or, in case their work was such that it was thought necessary to carry it on, apply through its governing body to the tax commission under the emergency provision of the statute, section 3099 of the Revised Code of 1928, for permission to incur an additional liability for that purpose, and if this right had been granted, appellee and his assignors could have continued work at the increased wage, but if refused it would have been necessary that the city lay them off for the remainder of the fiscal year. The majority view is that by following this course both laws would have been preserved and made effective.

Even if the correctness of this proposition be conceded, it has no application here, because the city did

not pay the wage fixed August 1, 1937, for any part of the fiscal year beginning July 1, 1937, but declined to obey the law in this respect, thereby forcing appellee and his assignors to quit work or continue under the old rate and sue for the increase within the one-year period of limitation. By its refusal to live up to the positive language of the Minimum Wage Law, the city placed itself beyond the protection this rule might have given it, because it could not refuse to pay appellee and his assignors the new per diem as long as there were budgeted funds for that purpose, and later on be heard to say in defense of any action that might be brought against it to recover the increase, that to have paid it from August 1, 1937, would have exhausted the budget before the end of the fiscal year. In the face of the Minimum Wage Law that was no concern of the city. The fact that living up to the plain requirements of that law would have depleted the budget before June 30, 1938, was a matter the city could not consider in determining whether it would do what my colleagues say it was bound to do, that is, pay appellee and his assignors the new wage, because that had already been fixed by the highway commission and to pay less was not only against the public policy of the state (*State* v. *Anklam, supra; Wright* v. *State,* 223 N. Y. 44, 119 N. E. 83; *Larsen* v. *Rice,* 100 Wash. 642, 171 Pac. 1037) but an express violation of the statute itself. So, no other alternative was open to the city as long as there were funds in that particular budget.

This being true, it is clear that from August 1, 1937, until the budget would have been exhausted under the new rate appellee and his assignors earned the amount the increase in the per diem gave them and were just as much entitled to it as they were to that the city paid them under the old rate. These earnings had merely

accumulated from August 1, 1937, until some time in April, 1938, when the budget under the new rate was exhausted and under the majority opinion the contract of employment automatically terminated. In so far, therefore, as this action seeks to recover the increase up to the date the budget would have been depleted under the new rate, it is not one seeking "payment for services for labor rendered after the amount budgeted for that purpose had been exhausted" but one asking merely for that admittedly earned while there was money in the budget to pay it.

The majority say, however, if I understand their view correctly, that the city paid appellee and his assignors these accumulated earnings between the date the budget would have been exhausted under the increased rate and the close of the fiscal year, and that while it may be true that both parties intended these payments, as they were made each month, to be for services performed during this period, they could not be used for this purpose because the services were illegally rendered, since, under the limitations of the budget law, the contract of employment terminated when the budget was exhausted and any extension of it beyond that date was absolutely void. The theory seems to be that the city could not pay for these services because they were performed pursuant to a void contract but that it could pay appellee and his assignors what they had earned before it was terminated, and that, this being true, these payments, though intended by the parties when made and received to be for services performed after the budget was exhausted, should be treated as payments of the amounts already earned and admittedly due when that occurred.

I cannot agree with this view. If the contract of employment was void as to appellee and his assignors after the budget was exhausted, it was void also as to

the city. If the services rendered by them during that time were illegal, the payments for such services were likewise illegal. The city bore the same relation to these payments that appellee and his assignors bore to the services for which they were made. Neither's rights under this void contract were greater than the other's. There was no way by which appellee and his assignors could get back their services from the city nor was there any method by which the city could force return from them of that which it had paid them for their labor. The *status quo* could not be restored. So, inasmuch as the work performed after the budget was exhausted must be treated as a gift from appellee and his assignors to the city, the payments made them by the city for these services must be regarded in the same light, though to do so means the city gets the better of the bargain, since it paid only the old rate when appellee and his assignors were entitled to the new. No one would contend for a moment that if appellee and his assignors had ceased to work when the budget was exhausted and others had taken their places, the payment to the latter of the amounts remaining in the budget but which appellee and his assignors had earned before the budget was depleted would defeat their action to recover these sums merely because to force the city to pay them would compel it to exceed its budget. And the same is true of appellee and his assignors, for their relation to those payments was in no sense different from that new people doing their work after the depletion of the budget would have sustained, because the employment of the latter would have been just as illegal and void under the budget law as was that of the former.

The city, it is true, had no legal right to employ appellee and his assignors, nor anyone else in their stead, after April 1, 1938, or thereabouts, when the

funds budgeted for the work they were doing were exhausted, that is, after the greater part of them had been paid to appellee and his assignors at the per diem existing prior to August 1, 1937, and the balance, representing the increase, had been earned by them but allowed to accumulate up to that time and were, therefore, legally applicable to no other purpose. But notwithstanding the budget law prohibits the city from incurring liability beyond the funds budgeted for the particular purpose, it did so anyway by employing appellee and his assignors, or at least some of them, during April, May and June, 1938, after the depletion of the budget, and since the funds with which it paid them for these services were those they had earned while there was still money in the budget, the city is not only morally but legally obligated to appellee and his assignors for these earnings, and should not now be heard to say, in effect, to appellee and his assignors:

"You had no right to work for me after the budget was exhausted nor I to pay you for your work but, notwithstanding this, you did work for me and I paid you for it. Both acts were illegal but I will treat the unlawful payments I made you as though they were payments of the wages you had already earned and were due you when the budget was exhausted. You have my thanks for your work during April, May and June, but nothing else, for if the payments I made you for that work are not regarded and treated as the earnings you permitted to accumulate up to the day the contract was terminated, I will be forced to pay them to you now and in so doing compelled to exceed my budget."

Whatever transpired between them after the budget was depleted and the contract terminated, that is, all that was done pursuant to the void contract, faded from the picture at that time, and the rights of the parties should be determined from the facts as they existed when that event took place and not otherwise.

To interpret the relations between the parties in any other light means merely that the city may use the budget law as a means of avoiding a just and legal obligation incurred under the Minimum Wage Law, and it is certain that no such use of it was ever intended by the legislature. These laws should be construed in such a way as to accomplish the purpose that brought them into being. Counties, cities and towns should be kept within their budgets but they should also be compelled to pay the minimum per diem wage fixed by proper authority for those employed by them in manual or mechanical labor. Both laws represent the public policy of the state in their respective fields and while both are important, the fact remains that the legislature has provided a much more serious penalty for a violation of the Minimum Wage Law than it has for a failure to comply with the budget law. The maximum for the former is a fine of one thousand dollars or imprisonment for six months, or both, while that of the latter is a fine of three hundred dollars, no imprisonment at all being prescribed. To hold, therefore, that the city is under no obligation to pay the wages earned by appellee and his assignors while there were funds in the budget to pay them, because to do so would force it to exceed its budget, is, to my mind, not only attaching to the budget law greater importance than the Minimum Wage Law enjoys, but virtually treating it as sacrosanct. It is important, but not so much so that cities, towns or counties should be permitted to use it as a justification for refusing to comply with the Minimum Wage Law.

The amounts sought by appellee for himself and assignors were earned between August 1, 1937, and July 1, 1938, but the record nowhere discloses what particular months each worked, though it does show the number of hours, and it is plain therefrom that

some were employed much less than a year. Those whose work did not extend throughout this full period but was completed before the budget was exhausted would, even under the majority opinion, be entitled to recover the increase for the time they actually worked prior to the termination of the contract of employment about April 1, 1938.

In my opinion the judgment should be sent back with direction to the trial court to ascertain the amount due appellee and his assignors at the time the budget was, or under the increased rate would have been exhausted, and render judgment accordingly.