99 Ariz. 269 (1965)
408 P.2d 818
CITY OF PHOENIX, a municipal corporation, Appellant,
v.
PHOENIX CIVIC AUDITORIUM & CONVENTION CENTER ASSOCIATION, INC., an Arizona Corporation, Appellee.
No. 8394.
Supreme Court of Arizona, En Banc.
December 13, 1965.
*271 Merle L. Hanson, City Atty., Phoenix, by Robert J. Backstein, Asst. City Atty., Joseph A. Matter, Chapman & Cutler, Chicago, of counsel, for appellant.
Snell & Wilmer, by Burr Sutter, Phoenix, for appellee.
Calvin Webster, City Atty., Tucson, by Harrison G. Dickey, III, Asst. City Atty., for amicus curiae City of Tucson.
Kramer, Roche, Burch & Streich, by Frank Haze Burch and Richard R. Filler, Phoenix, for amicus curiae Hotel-Motel Industry.
McFARLAND, Justice:
This is an appeal from a declaratory judgment wherein the trial court held that an agreement entered into between the City of Phoenix, hereinafter called the City, and the Phoenix Civic Auditorium & Convention Center Association, Inc., a nonprofit organization, hereinafter called the Association, was violative of the Arizona budget laws as provided for in A.R.S. § 42-301 to 42-312, as amended, and was therefore an invalid and void agreement.
In December 1963 the City and the Association entered into an agreement whereby the Association or others would finance the construction of a civic center and related facilities which would be leased to the City. Subsequently, the Association refused to perform under the agreement, alleging that the City did not have authority to enter into the agreement for four separate and distinct reasons hereinafter set forth. The City brought suit for a declaratory judgment to have the validity of the agreement determined.
The financing arrangement, hereinafter called the "agreement," recited the following terms. The City, in its desire to lease an auditorium and convention center, would purchase or condemn land within the City of Phoenix. Thereafter, the City would call for competitive bids for the lease of this land under the terms of a "ground lease," whereby the successful bidder would lease the land from the City for a period of forty (40) years, and, in addition, the lessee would agree to build an auditorium thereon. The City and the Association thereafter would enter into a "City Lease," whereby the lessee of the land would lease back to the City the land and the auditorium for a period of thirty-five (35) years. The five years intervening between the "ground lease" and the "City lease" were to insure that the auditorium would be completed before the City became lessee of the Association. The "City lease" provided that no bid could be accepted by the City unless a qualified appraiser determined that the monthly rental to be paid by the City under the terms of the "City lease" was fair and reasonable. In addition, if requested by the City, the Association agrees to operate the auditorium and convention complex on behalf of the City, *272 notwithstanding that the Association might not in fact be the successful bidder, and, is so requested, execute an "operating agreement."
Within 120 days after the City and the successful bidder enter into the "ground lease" and "City lease," the lessee under the "ground lease" agrees to pay to the City a rental under the "ground lease," in an amount equal to the City's cost incurred in purchasing or condemning the property. The "ground lease" provides the lessee must bear all construction risks and the insurance coverage during the period of construction. The "ground lease" also sets forth the provision that the lessee can mortgage only its leasehold interest to secure any obligations it may issue in conjunction with the cost of constructing the auditorium.
The "City lease" is in the form of a "net lease" whereby the lessee will pay to the lessor, the Association, the agreed monthly rental and all costs of operation, insurance, taxes, and other costs. Under the "City lease" certain conditions[1] are set forth in event the lease is breached by the City. The City lease expressly provides:
"The City agrees to pay to the Company, its successors or assigns, the sum of $ ____ per month, payable in monthly installments in advance. Said monthly rental shall be paid for and in consideration of the use and occupancy of the demised premises (including *273 the Auditorium Center) which the City receives and in consideration of the continued quiet use and enjoyment thereof as provided in Section 10.3 hereof, during each month for which said monthly rental is to be paid."
Although there is no basis shown in the record as to how a figure was arrived at, according to counsel who seem to be in absolute accord on the point, the minimum yearly rental would be $250,000, which when extended over the 35-year period of the City lease equals some $8,750,000. The City does not pledge any particular source of revenue to pay the monthly rentals. At the end of the City lease, providing the City has fully performed all the covenants thereunder, the ground lease would terminate, and the interests of the Association in the property would cease.[2]
As previously stated, the agreement does not pledge any particular source of City revenue to pay the monthly rentals. The brief of Amicus Curiae filed on behalf of the hotel-motel industry in the City of Phoenix states that, under City Ordinance G-557, a hotel-motel room tax has been levied specifically to raise the needed revenues for the cost of financing the construction of the auditorium. Since the agreement shows no pledge of any specific source of revenue, the issue of the room tax is not before this court. Amicus curiae will not be permitted to create, extend, or enlarge the issues. Bristor v. Cheatham, 75 Ariz. 227, 230, 255 P.2d 173.
It has been noted that the Phoenix Civic Auditorium & Convention Center Association, Inc., is a non-profit organization. The "agreement" provides:

*274 "F. The Association has not made and does not intend to make any profit by reason of any business or venture in which it may engage or by reason of the erection or operation of the said Auditorium Center, and no part of the Association's net earnings, if any, will ever inure to the benefit of any person, firm or corporation excepting only the City."
The City makes four assignments of error. In the first it is stated:
"The trial court erred in failing to determine that the City has authority under its charter and the statutes to enter into the `City Lease' required by the agreement and that the agreement is valid."
The answer to the first assignment depends upon the disposition of Assignments 3 and 4, so they will be treated together.
We shall first consider the second assignment of error, in which the City contends that the court should have determined that the use by the City of its power of eminent domain for the purpose of acquiring all or a part of the land to be required for the purpose of the ground lease was a valid exercise of its power of eminent domain.
A.R.S. § 12-1111 enumerates the following purposes for which eminent domain may be exercised by state, county, city, town, or village, or political sudivision, or by a person:
"Subject to the provisions of this title, the right of eminent domain may be exercised by the state, a county, city, town, village, or political subdivision, or by a person, for the following uses:
* * * * * *
"3. Buildings and grounds for the use of a county, city, town or school district."
Obviously, the buildings and grounds referred to in this section must be for a public use.
Article II, Section 17, of the Arizona Constitution, A.R.S., sets forth the conditions under which eminent domain may be exercised, and, in regard to the use of eminent domain for public use, states:
"* * * Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public."
Since condemnation of private property is authorized by the legislature and under the constitution for public use, the question then turns upon whether the acquirement and use of the convention center, as described in the agreement, is a public use. *275 The Arizona Territorial Court, in 1891, recognized the necessity of government's adapting itself to the existing conditions and the wants and needs of society. In Oury v. Goodwin, 3 Ariz. 255, 26 P. 376, the court said:
"All condemnation acts are predicated on the proposition that private ownership must yield to public necessity. `Public necessity' often means, as illustrated in the above instances, public convenience and advantage. We have many other instances of what `public necessity' means. Though telephones are of very recent invention, and reach the very limited few their use is held to be a public necessity; in other words, public convenience and advantage,  sufficiently so, at least, to justify the exercise of the sovereign power of eminent domain. Natural gas, though limited to localities small in area, is held also to be a public necessity, and therefore to justify the exercise of this extraordinary power. Laws relating to the telephone and natural gas are good illustrations of the adaption of the law to the existing conditions, and the necessity for the enforcement of the doctrine that private property must yield, on compensation being made, to the public welfare. But recently both the telephone and natural gas were unknown, now both are necessary to the public use; that is, we submit to the public convenience and advantage. `Government must adapt itself to the existing condition and wants of society, or its efficiency is destroyed.' Swan v. Williams, 2 Mich. [427] 438. `This right of resumption [condemnation] may be exercised not only when the safety, but also when the interest, or even the expediency, of the state is concerned.' Beekman v. [Saratoga & S.] Railroad Co., 3 Paige [45] 73, 22 Am.Dec. 679. Property may be taken under power of eminent domain, where the use is merely amusement or recreation, as for public drives or parks. Higginson v. Inhabitants of Nahant, 11 Allen [93 Mass.] 530; In re Mount Washington Road Co., 35 N.H. 134; In re Bushwick Avenue, 48 Barb. 9; [St. Louis] County Court v. Griswold, 58 Mo. 175; [Brooklyn Park] Commissioners v. Armstrong, 45 N.Y. 234, 6 Am.Rep. 70." 3 Ariz. at 273, 26 P. at 382.
Many courts have held that a municipal corporation has authority to construct an auditorium without express authority being granted for such purpose. Yokley on "Municipal Corporations," Vol. 3, § 509(f), at page 230:
"(f) Auditoriums.  It is well settled that a municipal corporation has the right to expend public funds for the construction of a public auditorium *276 without express authority being granted for such purpose."
Meyer v. City of Cleveland, 35 Ohio App. 20, 171 N.E. 606; Wheelock v. City of Lowell, 196 Mass. 220, 81 N.E. 977; Hutcheson v. Atherton, 44 N.M. 144, 99 P.2d 462; Green on Behalf of City of Columbus v. Thomas, 37 Ohio App. 489, 175 N.E. 226; City and County of Denver v. Hallett, 34 Colo. 393 83 P. 1066; Anderson v. Thomas, 166 La. 512, 117 So. 573; Bernstein v. City of Pittsburgh, 366 Pa. 200, 77 A.2d 452; McQuillin on "Municipal Corporations," 3d Ed., Vol. 15, Para. 39.21, especially footnote 71.
In City and County of Denver v. Hallett, supra, the court, in holding the City of Denver had authority to issue bonds for the construction of an auditorium, said:
"The general purpose of all general municipal corporations is to promote the general welfare and happiness of the people; and provisions are generally made for the suppression of vice and immorality, and the advancement of public health and good order, and the promotion of trade and industry. For many years Denver has had power under her charter to appropriate funds for the entertainment of visitors and for the expenses of funerals, power to take an enumeration of the inhabitants, to foster and encourage manufactories, for laying out and ornamenting grounds for a cemetery and for the sale of lots therein, and to support or own a public library. Not one of these powers can be regarded as indispensable to a municipality. Municipalities are permitted to exercise them because they tend to the advancement, the culture, the convenience, and the general welfare of the public. It is not a valid objection to the exercise of such powers that one class of the inhabitants would receive more benefit than another. The test is whether the power, if exercised, will promote the general objects and purposes of the municipality, and of this the Legislature is the judge in the first instance; and, unless it clearly appears that some constitutional provision has been infringed, the law must be upheld." [Emphasis added.] 34 Colo. at 400, 83 P. at 1068.
We therefore hold that an auditorium and convention center, as described in the agreement, is for public use, for which the power of eminent domain can be exercised.
Defendant also contends that the agreement to transfer the property to the non-profit corporation invalidates the power of the City to obtain the grounds by the exercise of its power of eminent domain. This contention is without merit. The public purpose for which land is acquired by the exercise of eminent domain is not affected by subsequent conveyance or *277 lease of the same; providing, the public purpose is not abridged thereby, where a city retains the control of the property, if it is evident that it is acquiring it for public use. Haggerty v. City of Oakland, 161 Cal. App.2d 407, 326 P.2d 957, 66 A.L.R.2d 718; Bernstein v. City of Pittsburgh, supra; McQuillin on "Municipal Corporations," 3d Ed. Rev. 1964, Vol. 11, Para. 32.114.
The real test is whether the land is to be used for the purposes for which it is condemned  which must be for public use. In Rehfuss v. City of LaCrosse, 240 Wis. 619, 4 N.W.2d 125, the court, in upholding the city's exercise of its power of eminent domain, said:
"* * * The real question for decision is whether the lands in question were acquired by the defendant city for a public purpose. The mere fact that the legal title of the property owned by the LaCrosse Public Library is in a private corporation does not prevent it from being devoted to a public use. * * * That the maintenance and operation of a library by a nonprofit corporation for the use of the general public is a public purpose cannot be questioned." 240 Wis. at 620, 4 N.W.2d at 126.
In City of Phoenix v. Superior Court of Maricopa County, 65 Ariz. 139, 175 P.2d 811, we upheld as a public purpose the expenditure of money by Phoenix to construct housing for veterans and their families, and pointed out that the Phoenix City Charter authorized condemnation of property for public purposes. Also, in Humphrey v. City of Phoenix, 55 Ariz. 374, 102 P.2d 82, we upheld the use of eminent domain by cities for the acquisition of land to be sold to private interests for redevelopment and leasing to tenants for profit as part of the city's redevelopment program. City of Phoenix v. Linsenmeyer, 86 Ariz. 328, 346 P.2d 140.
Under Assignment 3 the City contends that the court erred in holding the proposed lease violates Article IX, Section 8, of the Arizona Constitution, in regard to debt limitation of counties, cities, towns, and school districts, and other municipal corporations. Under Assignment 4 the City contends that the court erred in holding that performance of the agreement by the City would violate the provisions of the budget laws of Arizona. If the agreement violates either of these debt limitations, Assignment 1 is not well founded.
Let us first examine the proposal, and see what the agreement will accomplish. The City desires to own a civic auditorium. The name of the Association  The Phoenix Civic Auditorium and Convention Center Association, Inc.  and the facts set forth in the agreement show that it is a non-profit organization set up for the purpose of assisting the City in accomplishing its objective. *278 The agreement specifically provides that the Association will not make any profit, and that all net earnings are to inure to the City. The bid for the construction is not to be accepted until approved by the City after an appraisal has determined that the rentals to be paid are fair and reasonable.
The logical conclusion therefore is that the rentals are to be fixed at a figure sufficient to make the payments to the Phoenix Civic Auditorium & Convention Center Association, Inc., for the cost, including interest and other incidental expenses of the auditorium and convention center. The actual figures are not supplied in the request for the declaratory judgment, but the above conclusions are based upon the agreement, the record made in the case, the abstract, and the representations made by the attorneys in their briefs. The question then is whether such an agreement violates the constitutional limitation in regard to municipal corporations prohibiting indebtedness in excess of 4 percent of the taxable property determined by the last assessed valuation except in certain instances,[3] and the statutory annual fiscal budget limitations prohibiting expenditures, debt obligations, or liabilities incurred or created in any fiscal year in excess of the amount provided for in that fiscal year's budget.[4]
*279 At the time this suit was filed the assessed valuation of taxable property in the City of Phoenix was $532,456,980, four percent of which is $21,298,279.20 and the indebtedness filed (for purposes other than water, artificial light, and sewers) was $17,565,000. If the lease is in reality a purchase agreement, and thereby constitutes an additional debt of $8,750,000 against the City, it is evident that it would violate both the constitutional debt limitation and the statutory budgetary limitation.
To answer the question as to whether the agreement violates the constitutional debt limitation and the budget limitation, we must determine whether the agreement constitutes a debt for the total amounts under the lease agreement to be paid by the City.
In 1955 the Supreme Court of the State of Washington, in the case of State ex rel. Washington State Bldg. Financing Authority v. Yelle, 47 Wash.2d 705, 289 P.2d 355, considered a similar problem and ruled that a lease agreement providing for payments was in effect an installment purchase agreement. In Yelle, supra, the constitutionality of an act creating the State Building Financing Authority was challenged. By the terms of the act, the building authority would lease or purchase land from the state's institutions of higher learning and various state agencies, erect buildings thereon, and then lease them back to the institutions or agencies. The construction was to be financed by the issuance of revenue bonds to mature after thirty years, and these bonds were to be the obligation of the building authority alone.
The authority had the power to pledge as security for the bonds any or all of its revenues or receipts. The sole source of revenue for the building authority was the rentals to be charged the institutions of higher learning. In fact, the state treasurer was authorized to transfer, as fulfillment of the rent due the building authority, any funds held in the state treasury for the lessees (institutions and state agencies). The Washington court noted "that the rentals will be paid from funds derived from tuitions, capital grants and appropriations to the various institutions and agencies." 289 P.2d at 357. In holding the financing arrangements with the building authority to be violative of the constitutional debt limitation, the Washington court stated:
"The state may contract to lease property from private corporations or individuals if the obligations can be met out of current revenues. If it is good business to enter into a long-term lease, it may do so. Likewise, it may enter into a long-term lease with a `body politic and corporate,' provided rentals can be paid, when due, from current appropriations. Our problem is to determine whether this plan is a leasing arrangement, or whether it is the acquisition by purchase of capital improvements, *280 for which the state cannot now pay and payment for which is therefore to be made in annual installments extended over a period of thirty years.
* * * * * *
"The rental payments and other charges due and owing to the authority from the lessees shall be transferred to it by the state treasurer. The legislature shall appropriate sufficient moneys to the institutions of higher learning or agencies of departments to cover the rental payments.
"Although the authority is designated as a `body politic and corporate,' it is actually an agency of the state created to finance the construction of certain public buildings, and which must even consult the State Finance Committee before issuing bonds. It is composed of three state officials whose primary concern is the state's welfare. The authority does not deal at arm's length with the various state agencies to which it leases buildings which it has constructed under the financial plan herein being considered. Their relationship is not the ordinary landlord and tenant relationship.
"It is significant that the bonds shall mature in thirty years and that the leases shall run thirty years. There is no provision in the act for releasing. When a series of buildings will have been leased for thirty years and the principal and interest of the bonds sold to finance their construction will have been paid in full, the authority's responsibility for, and interest in, that particular project, will have been completed. The authority is not in business to make money.
"It is contended that this is actually a leasing arrangement rather than the purchase of capital improvements to be paid by installments, because the act provides for the purchase by any institution of higher learning or agency or department when sufficient funds are available. Of course, such purchase could not be made until the bonds are paid in full, which would be at the expiration of the term of the lease, because the rental payments are pledged as security to the bondholders. No provision is made as to the amount of the purchase price. It is inconceivable that, after paying the rentals hereinbefore described, for thirty years, the agencies would then pay the true value as a purchase price for the properties, rather than merely a nominal sum. In fact, they will have already paid for their individual buildings. We mention the institutions of higher learning and agencies or departments of government. It is actually the state which is paying the rentals. It is actually *281 the state which is attempting to use this means of acquiring buildings for its own use." 47 Wash.2d at 712, 289 P.2d at 359.
In concluding, the court stated:
"We recognize the housing problem with which the state is confronted. Nevertheless, we can not permit the exigency of the situation to override the constitutional safeguard against improvidence and the integrity of the state's economy. We can not resort to dexterity of judicial thinking in order to assist the state in its problem. We can not close our eyes to what is actually being attempted. When we strip the plan down to fundamentals, we find that it is not a leasing arrangement between landlord and tenant, but the installment purchase by the state of certain buildings and facilities with state moneys raised by taxation, far in excess of the constitutional limitation." 47 Wash.2d at 715, 289 P.2d at 360.
Another leading case on this subject is that of McCutcheon v. State Building Authority, 13 N.J. 46, 97 A.2d 663, in which the financing arrangement was almost exactly the same as found in Yelle, supra, with the exception that in McCutcheon, the authority was evidently dissolved upon payment of the bonds issued to finance the state buildings. In holding the bond issue to be violative of the reason and spirit of the New Jersey constitutional debt limitation, the court stated:
"* * * While in form a way of providing the State with leasehold interests in building facilities for public use, in reality the design of the act is to enable the State by contracts of purchase to acquire for state use buildings possessed and constructed by the Authority by means of bond issues sustained by the State's promise to supply in the guise of rentals sufficient money to liquidate the bonds, available only through the medium of annual appropriations. * * * The legislation proceeds upon the hypothesis that the fulfillment of the project will not burden the State with a debt or liability within the constitutional sense. But in this the accent is on the external appearance rather than the substance. The label is unimportant; it is not the form but the essence that controls. It is an obvious truism that constitutional limitations may not be set at naught by indirection.
* * * * * *
"Thus, the Authority is constituted an instrumentality of the State designed to authorize the construction of building facilities for the use of the State that, if accomplished by the State directly, would be ineffectual as in excess of the constitutional debt limit, absent the referendum approval of the electorate *282 in consonance with the debt-limitation provision. Such is indubitably the nature of the projects undertaken by the resolution of the Authority now under review  a contrivance to accomplish that which by the same means the State could not do directly.
* * * * * *
"* * * While the payments thus made by the State through its governmental agency take the form of `rentals,' they are in substance and effect the purchase price of the property, for they are to be sufficient in amount to defray the Authority's operating expenses and in the end to liquidate the principal of the bonds and the interest accruing thereon. Were this not so, the Authority would be unable to function, for it would have no other source of revenue adequate to retire the bonds. * * *" 13 N.J. at 57, 97 A.2d at 668, 669.
Quoting with approval the Supreme Court of Maine, McCutcheon, supra, states:
"And the Maine Supreme Court invoked the same principle under somewhat similar circumstances. The holding there was that the `so-called lease is not in legal effect a lease, it is a contract of purchase'; the `total amount of so-called rental is the purchase price the State is to pay for the property', and
"`When paid in full it will liquidate the entire indebtedness of the Building Authority. Being a contract of purchase, obligating the State to pay the purchase price, unless the entire amount thereof is to be paid pursuant to an appropriation presently made from funds or revenues currently available therefor, such contract of purchase would in the constitutional sense be a liability created by the Legislature on behalf of the State. It would constitute a liability which would have to be included with the existing debts and liabilities of the State in determining whether or not they exceed the $2,000,000 limit set forth in Section 14 of Article IX of the Constitution. If such contract price in and of itself, or together with the existing debts and liabilities of the State, should exceed the constitutional debt limit, the so-called lease would be void. A contract which obligates the State to pay money over a period of years for the purchase of property, creates a liability. It makes no difference whether you call the payments the State is obligated to make rental or installments on the purchase price, the legal effect is the same. If you vitiate the provision for the so-called lease and payment of rental the Building Authority cannot function. The ultimate *283 source of all funds for the liquidation of the indebtedness of the Building Authority is the State of Maine. Under the so-called lease, the State obligates itself to furnish them. This creates a liability. If the aggregate amount of it either by itself or together with existing obligations exceeds the debt limit of the State, it is beyond the power of the Legislature to impose it.' Opinion of the Justices, [146] Me. [183], 79 A.2d 753, 756 (Sup.Jud.Ct. 1951)
"Here, unlike those that have gone before, the subject of the Authority's domain is not a toll or self-sufficient facility; the Authority is obliged to lease its building facilities to the State or to its departments, agencies, or instrumentalities, and the State Treasury is the sole source of its revenue, in the form of legislative appropriations utilized for the payment of an agreed `rental' in amount adequate to defray the Authority's operating expenses and service and effect the ultimate retirement of the bonds. Thus, the Authority is non-revenue producing; it is an instrumentality of the State whose function is wholly dependent upon state moneys raised by taxation; the leasing device is in essence an installment purchase by the State of office building and personnel-housing facilities. * * *" 13 N.J. at 62, 97 A.2d at 670, 671.
The New Jersey court was again called upon to pass upon the legality of "lease-back" agreements in the case of 405 Monroe Co. v. City of Asbury Park, 40 N.J. 457, 193 A.2d 115, and did not change the rule of law laid down in the McCutcheon case. The McCutcheon case was cited in the Monroe case, supra, and it was contended that, under the reasoning of the McCutcheon case, the lease was invalid. The court pointed out that a good faith agreement had been entered into between the plaintiff and defendant whereupon plaintiff undertook to have alterations constructed and thereby plaintiff incurred considerable investment of his own funds. The city attempted to void the obligation some three years later. The plaintiff would have been left with a building of unmerchantable quality except as to a governmental consumer. The court, in discussing the equity of the situation, stated:
"We have heretofore noted `the strong recent trend towards the application of equitable principles of estoppel against public bodies where the interests of justice, morality and common fairness clearly dictate that course.' * * *" 40 N.J. at 463, 193 A.2d at 118.
However, after this discussion of the inequities of holding invalid an agreement that had been in effect for 3 years, the *284 court based its ruling upon the grounds that the lease was for the life expectancy of the structure, thereby distinguishing it factually from the McCutcheon case. The court said:
"Since a lessor expects to recover out of rent the depreciation in his investment in addition to a return upon that investment, the amount of rent necessarily depends upon the life expectancy of the structure. If the term of a lease equals the expected life of a building, the lessor will seek to recapture its full value within that period. In such circumstances an option to buy the residual value at the end of the term for a small sum is compatible with the concept of a lease.
"Here we have a structure which as a ramp garage was quite single in its purpose and with the alterations we have described became uniquely so, since a jail, a courtroom, police headquarters, and pistol range are of no general utility. Hence the lessor would expect to recoup his investment during the period of the lease. A realtor testified that after 25 years the structure would be of no value to the owner and the cost of demolition would equal the land value. That testimony is somewhat supported by the objecting councilman himself, who in opposing the transaction argued that at the end of the term the city would have on its hands a decrepit building which then would be some 55 years old.
"In these circumstances the parties could understandably have intended the stipulated periodic payments to constitute rent and nothing else. * * *" 40 N.J. at 465, 193 A.2d at 119.
It will be noted that the court in the Monroe case held that the agreement was a lease agreement upon the basis that the rentals were paid for the use of property; that the value of property would be depreciated out at the end of the lease; and that the cost of demolition would equal the value of the land. Hence, the city would receive no value except the use of the property during the lease, which differentiates this from the McCutcheon case, supra. The lease-back in the instant case is similar to that in the McCutcheon case. The Association in the instant case is to perform a similar purpose to that of the state building authority in the McCutcheon case, supra, and the functions of the lease-back agreements in the two cases are similar.
The basis for the decisions in the Yelle and McCutcheon cases, supra, is that the payments on the lease agreement were to be made from general revenues rather than from special revenues; also that the payments under the lease paid for the property included and were in fact payments on a purchase price of the same. While such payments were in the form of "rentals" they were in substance and in effect the *285 purchase price of the property, in that they were of sufficient amount to defray the operating expense and in the end liquidate the principal of the bonds and interest issued by the authority for the purchase of the property.
We are not presented with the question as to the validity of an agreement where payments are to be made solely from a special fund no part of which is derived from general taxes.
In the instant case payments are to be made from the general fund, and therefore this case is distinguishable from those cases where payments are made from revenues or from a special fund not obtained from general taxes. We have previously held the issuance of bonds which are not payable from general funds but solely from revenues of an independent revenue-producing asset or utility does not constitute a debt of the municipality within prohibition of the constitutional or statutory debt limitation. Board of Regents of University of Arizona v. Sullivan, 45 Ariz. 245, 42 P.2d 619; and Guthrie v. City of Mesa, 47 Ariz. 336, 56 P.2d 655. However, the agreement must clearly disclose that no part of the payments are to be made from the general fund.
In the case of State Office Building Commission v. Trujillo, 46 N.M. 29, 120 P.2d 434, the New Mexico Supreme Court held that a lease-back arrangement violated a similar constitutional debt limitation to that of our own state for the reason that the special fund set up under the act from which payments were to be made did not disclose that no part of the transaction was to be paid from general taxes. The court said:
"We have thus dwelt upon our decisions to show that so far as we have adhered to the special fund doctrine, it may be said for the purpose of this discussion that it means that thereby and thereunder any financial obligation of the state, not otherwise constitutionally objectionable, is valid without approval of the electorate if it is to be paid for and discharged in full from moneys derived from sources other than from general taxation, as contemplated under Section 8 of Article IX of the State Constitution; and to show that for such an obligation to come under the special fund doctrine, the creation of the obligation and the law authorizing it must specify and set out the sources for payment thereof and thereby disclose that no part of the payment is to be obtained from general taxation.
* * * * * *
"* * * As we have pointed out, before a special fund scheme may prevail it is necessary that the sources for payment of the financial obligation be set out in the creation of the obligation *286 in order to clearly disclose that no part of the obligation is to be paid or satisfied from general taxation. Absent such a showing in this case, it is inevitable that to pay off the rentals a resort to general taxation is or may be necessary; and, therefore, the special fund doctrine cannot here obtain. This feature of the doctrine is well expressed under the quotation above set out taken from the case of Brash v. State Tuberculosis Board, supra, [124 Fla. 652, 169 So. 218] which we requote to this extent: `And, in the case of enterprises authorized by the Legislature to be embarked upon through state agencies, a particular scheme of financing will be held to be valid only where it is clearly demonstrable from the specific terms of the financing proposal itself that no tax burden or pecuniary liability of the state to appropriate or pay for the indebtedness about to be incurred will ever arise, or be looked to as security, in whole or in part, for repayment of the borrowed moneys.'" 46 N.M. at 46, 120 P.2d at 444, 445.
In the instant case, just as in McCutcheon, Yelle, and Trujillo, the payments are not from a special fund but from the general funds, and no one could seriously contend that part of the monthly payments is not for payment upon the purchase of the property. As a consideration for the payments under the lease agreement the City not only receives the use of the property during the term thereof, but it receives all of the net profits therefrom, should there be any, and the property itself at the end of the lease. So the property is part of the consideration included in the lease payments as well as the use thereof during the term. The agreement therefore amounts to nothing more than a purchase agreement.
In the case of American-LaFrance & Foamite Corporation v. City of Phoenix, 47 Ariz. 133, 54 P.2d 258, the same principle was presented. The City of Phoenix entered into an agreement which was called a lease agreement, which provided:
"* * * That the party of the first part * * * does hereby agree to lease, and the party of the second part does hereby agree to hire the following property to be manufactured by the party of the first part, [then follows the description of the property] * * *" 47 Ariz. at 135, 54 P.2d at 259.
It then provided that in consideration of the leasing of said property the city would pay certain sums as rental therefor. The schedule of payments was upon a yearly basis. Then, at the end of the agreement, it was provided that in the event all payments were made upon receipt of payment of an additional $1.00 above the rent money, LaFrance would execute and deliver a good *287 and sufficient bill of sale. In disposing of the question as to whether the agreement violated the provisions of the budget law, after discussion of our previous cases, we said:
"And we have adhered to this principle in the cases of Automatic R.M. Co. v. Pima County, 36 Ariz. 367, 285 P. 1034, Board of Supervisors v. Udall, 38 Ariz. 497, 1 P.2d 343, and several others. By the express terms of the law it applies to all incorporated cities and towns to the same extent as it does to counties. If then the contract in question violated the budget law, it was void ab initio, and could not be validated by any act of defendant. It will be seen upon considering its terms that whether we call it, as it is denominated upon its face, a lease, or whether, as it is insisted by defendant, it is in reality a conditional sales contract, it does constitute a binding obligation upon defendant to pay to plaintiff the total sum of $29,160. This obligation, under the terms of the contract, could not be avoided by a surrender of the property before the expiration of the time set forth for the completion of the payments, for it recites that, even though there be a default in the payments and plaintiff repossesses itself of the engines, `the said party of the second part shall be and remain liable to the party of the first part for any and all rental or other payments payable under the provisions hereof and unpaid at the time of said retaking of the apparatus, including such rental payments so defaulted.'
"The budget for the city of Phoenix for the year in which the engines were bought provided only the sum of $5,950 for that purpose. Certainly a contract which created an indebtedness on the part of defendant for $29,160, regardless of when or how the payments were to be made, could not be justified under the amount budgeted for fire apparatus." 47 Ariz. at 140, 54 P.2d at 261, 262.
As stated in the LaFrance case, it is immaterial whether the agreement is called a "lease," as insisted by the City (in the instant case), or a purchase agreement. It constitutes a binding obligation upon the City to make all the payments provided for, and is therefore a debt, and violates both the constitutional debt limitation and the statutory budget limitation.
The principles set forth in McCutcheon, supra, Yelle, supra, and LaFrance, supra, are the same. Applying them to the instant case we can only come to the conclusion that it is the general taxing power of the City which really constitutes the security for the debts. True, possibly a very great proportion of the rentals may be paid from the funds received from the successful *288 operation of the convention center; but, success or no success, it is always the City which remains liable for the duration of the City lease. We must look to the transaction for what it is, and not what it is called  an obligation of the general fund of the City of Phoenix for a period of thirty-five years. This obligation exceeds the constitutional debt limitation, cannot be allowed to vitiate the expressed intention of the constitution and that contained in the statutory budget limitation. Section 7 of the City lease provides that in the event the City should default in its payments the Association could take possession and terminate the City lease, and release the premises and in the event the rents therefrom were not sufficient to pay the amounts due under the City lease, the City would be liable for any deficiency, and the Association might bring an action for such monthly deficiency or deficiencies. While this provision is plain that it was the intent of the parties that the total sum due under the lease is a debt of the City, it would be the same if the agreement did not contain this provision because there is a definite promise to pay, and the Association could bring suit for any payments due in default, regardless of whether they retook possession or not. There is no question but what the total sum of the payments as contracted in the agreement is an indebtedness against the City. In Nelson v. Wilson, 81 Mont. 560, 264 P. 679, the court, in defining a debt, held:
"* * * The word `debt' `is as applicable to a sum of money promised at a future day as to a sum now due and payable; the former is a debt owing; the latter, a debt due.' Anderson's Law Dictionary, 315. A sum of money which is payable is a debt, `without regard to the fact whether it be payable now or at a future time.' People v. Arguello, 37 Cal. 524. The money need not be immediately payable; obligations yet to become due constitute indebtedness, as well as those already due. St. Louis Perpet. Ins. Co. v. Goodfellow, 9 Mo. 149. `A party becomes indebted when he enters into an obligation to pay.' * * *" 81 Mont. at 571, 264 P. at 683.
There is no difference in a debt created by a so-called lease which is payable monthly and a note providing for monthly payments without a provision that upon the default of one all would become due and payable. The fact that the Association would have to bring more than one action would not change the debt situation. McCutcheon v. State Building Authority, supra, and State ex rel. Washington State Bldg. Financing Authority v. Yelle, supra.
The City contends that the agreement to pay rentals for a 35-year period does not violate the constitutional debt limitations on *289 the grounds that they are not an obligation to pay a debt in praesenti  that the obligation is nothing more than a monthly obligation for the continued use and enjoyment of the property for the months for which the rent is paid. We cannot agree with this contention, for the reason as we have set forth herein that a large part of the payments is for the purchase of the property, and under Yelle, McCutcheon, and La France cases, supra, and the many cases cited herein, such payments are for more than just the use of the property.
The City relies heavily upon the case of Dean v. Kuchel, 35 Cal.2d 444, 218 P.2d 521. There the state entered into an agreement wherein a partnership leased property from the state for 35 years for one dollar, and, in turn, agreed to erect buildings thereon, lease them back to the state for 25 years, and at the end of the lease the property was to vest in the state if all covenants were performed. The weakness of the Dean case is not so much in the law enunciated therein but in the application of the law to the facts. The court, in discussing lease-back agreements, stated:
"`* * * if its designation as a "lease" is a subterfuge and it is actually a conditional sales contract in which the "rentals" are installment payments on the purchase price for the aggregate of which an immediate and present indebtedness or liability exceeding the constitutional limitation arises against the public entity, the contract is void. * * *'
* * * * * *
"* * * We find no logical distinction between the Offner case and the one at bar. It is true that there was an option to purchase in the former rather than a vesting of title at the end of the term in the instant case, but as far as liability is concerned, the state under the instrument here is in a better position, for it gets title without the payment of anything other than the rental. The essence of the Offner rule is that the payments are for a month to month use of the building. Here it is clearly stated that the rentals are for that purpose. There is no substantial or logical difference between the option to purchase in the Offner case and the vesting of title at the end of the term in this case. True, the city was not bound to execute the option and thus pay the purchase price, but it was required to pay the rentals. Here the rentals also must be paid but the state need not pay any more. We are satisfied therefore that the instant transaction qualifies as a lease for the purpose of the debt limitation." 35 Cal.2d at 447, 218 P.2d at 523.
The court in the Dean case relied upon the case of City of Los Angeles v. Offner, 19 Cal.2d 483, 122 P.2d 14, 145 A.L.R. 1358. In the Offner case there was a proposed *290 agreement wherein the city would lease land at a nominal rental of one dollar per month for ten years to a successful bidder, who in turn agreed to build an incinerator thereon and lease it back to the city at a fair monthly rental. The city had an option to purchase the incinerator at various intervals during the term of the lease, for the fair appraised value of the incinerator at the time the option was exercised. If the city did not exercise the option, then the bidder was given sufficient time to remove the incinerator, as the title to it had always remained in the bidder. The court based its opinion largely upon the fact that title to the property had remained in the bidder, and the city could only purchase the property at the appraised value thereof, and under this state of the facts, the court held:
"* * * The transaction here challenged constitutes in reality a lease with reasonable terms and option to purchase. We find no evident present intention on the part of the city to purchase the incinerator * * *" 19 Cal. at 467, 122 P.2d at 16
In the Dean case the payments were held to be rentals on the grounds that there was no logical distinction between that case and the Offner case. The court did not change the rule of law as enunciated in the Offner case, but used a strained construction of the facts. Justice Edmonds dissented, and was joined by two other justices in voting for a re-hearing which in effect makes the case a four-to-three decision.[5] The holding in the Dean case is not in accord with the best reasoning in the interpretation of constitutional debt limitations, as applied to "lease-back" agreements. The best reasoned opinions under facts similar to the instant case hold that they are in effect purchase agreements. Opinion of the Justices, 251 Ala. 91, 36 So.2d 475; Opinion of the Justices, 146 Me. 183, 79 A.2d 753; State ex rel. Public Institutional Bldg. Authority v. Neffner, 137 Ohio St. 390, 30 N.E.2d 705; State ex rel. Public Institutional Building Authority v. Griffith, 135 Ohio St. 604, 22 N.E.2d 200; Austin v. Healy, 376 Ill. 633, 35 N.E.2d 78; Cerajewski *291 v. McVey, 225 Ind. 67, 72 N.E.2d 650, 171 A.L.R. 723.
A helpful discussion on this subject is found in a George Washington Law Review article, Vol. 25, page 377, at page 392:
"B. Direct Relation of `Rent' to Debt Service on Bonds.

"Annual rent payments are indistinguishable in fact from annual debt service on bonds. Under lease-financing legislation, rent is never related to any market value for the property (in most cases there is no such value because of the unique purpose for it) but is always the exact amount needed to pay for debt service (annual principal and interest) on long-term bonds or notes of the lessor to finance the improvement, plus a proportionate share of the lessor's administrative overhead, plus an amount sufficient to build up a reserve of, usually, one year of debt service on the lessor's bonds, plus the cost of any maintenance, repair, replacement and insurance borne by the lessor and plus an amount for `the fulfillment of the terms and provisions of any agreements made with the purchasers or holders of any such bonds.' The latter might include attorneys' fees and an annual fee of a trustee to supervise the relation between lessor and the lessee. The rent is the amount that would be paid as debt service on the lessee's own bonds (if any could be issued) plus the additional expense of a one-year reserve, a trustee's fee, and insurance."
As pointed out in the article, rent payments such as provided for in the instant case, are indistinguishable from annual debt service. It is clear that under the authorities discussed and cited herein the agreement between the City and the Association is in effect a purchase agreement for the property and the payments constitute a debt against the City which exceeds the constitutional debt limitations, and is in violaion of the statutory budget limitation.
We note the Arizona legislature, since this suit was instituted in the lower court, enacted an amendment (1965 Session Laws, Chapt. 22) to the budget laws of Arizona by adding a section, A.R.S. § 42-303.02. Under this section, the legislature specifically approves long-term leasing agreements entered into by cities and towns for the purpose of leasing municipal auditoriums and convention centers, so long as such agreement is submitted to and approved by a majority of the electors of the municipality involved, and provided the monies for the rental payments due under any such lease shall be derived from revenues other than those collected for general funds, and provided that no tax shall be imposed on real property to support the operation, maintenance, or payment of rentals therefor.
*292 This amendment does not affect the instant case, as it expressly states that it is not applicable to leases entered into before or after, if such leases would have been valid regardless of the enactment of the provisions of the law. We express no opinion as to the effect of any action which might be taken pursuant to such statute. We recognize that the City officials, in entering into the agreement presented in the instant case, are of the opinion that the building of a civic auditorium and convention center would be in the interests of the people of the City of Phoenix. The people, in framing the constitution, were undoubtedly of the opinion that constitutional safeguards against indebtedness were to the best interests of the economy of the state, and the legislature was evidently of the opinion that statutory budget limitations were in the interests of the people. We cannot override these safeguards to meet the exigency of the situation.
We cannot make constitutional limitations meaningless by judicial circumvention in order to assist the City in acquiring a civic auditorium and convention center, no matter how desirable it might be. Nor do we pass upon the desirability of such a constitutional debt limitation and statutory budget limitation. We merely apply the law as we find it. We cannot close our eyes to the fact that the leasing arrangement is nothing more than an installment purchase plan for the City to acquire its objective, binding the City and its taxpayers irrevocably to a program of indebtedness for thirty-five years which far exceeds the constitutional limitation. The remedy is a constitutional amendment.
For the reasons stated, we hold that the agreements proposed by the City would violate both the constitutional debt limitation and the statutory budget limitation.
LOCKWOOD, C.J., STRUCKMEYER, V.C.J., and UDALL, J., concurring. BERNSTEIN, Justice (dissenting).
I, in this dissent make only the limited legal determinations that a properly drafted leaseback agreement would not violate any Arizona constitutional provision, that the construction of an auditorium and civic center is a public purpose, and that the requirements of the Budget Law will be met. Policy matters relating to the desirability or necessity for this project are for decision by the City Council.
The problem is the contention that the City Lease creates an indebtedness beyond the amount the City is permitted to incur because of the limitation imposed by Article 9, Sec. 8 of the Arizona Constitution. The majority relies upon American-La-France and Foamite Corp. v. City of Phoenix, 47 Ariz. 133, 54 P.2d 258 (1936). This case has little relevancy to the problem involved here. The court discussed the Budget Law, not the Constitution. It refused *293 to permit the City to acquire a fire engine under an arrangement which it regarded as the equivalent to an installment purchase. Modern security devices developed to facilitate the sale of personal property all serve the same economic end, whether they are called conditional sales, purchase money chattel mortgages, lease and purchase contracts, leases with options to purchase, bailment leases, equipment trusts or whatever terminology is used. Where real property is involved, however, "lease" does have a precise technical meaning, as do "rent" and "debt". A lease of real property is a conveyance not a contract and the principles which govern its construction go back to feudal times. As the Supreme Court of Minnesota said in Ambrozich v. City of Eveleth, 200 Minn. 473, 274 N.W. 635, 112 A.L.R. 269:
"* * * It is not permissible to consider what the result would be if the base [sic] lease were considered merely as a contract, so far as concerns the unaccrued rents. See Viterbo v. Friedlander, 120 U.S. 707, 7 S.Ct. 962, 30 L.Ed. 776; 3 Williston on Contracts (Rev.Ed.) § 890; In re Barnett (C.C.A.) 12 F.2d 73; 21 Cal.L.R. 561, 562, 563; 33 Col.L.R. 213, 216, 217. Courts accept the established law applicable to leases. Illustrative of the binding effect of the settled law in this respect is Gardiner v. [William S.] Butler & Co., 245 U.S. 603, 38 S.Ct. 214, 62 L.Ed. 505, in which Mr. Justice Holmes stated that even though there were `plausible analogies' for a contrary contention, the law of leases must be applied, in the following apt expression: `But the law as to leases is not a matter of logic in vacuo; it is a matter of history that has not forgotten Lord Coke.' * * * Rules so well settled should be overthrown only by legislation.
"`Rent' is a sum stipulated to be paid for the use and enjoyment of land. The consideration for the rent is the occupation of the land. In re Roth & Appel, 181 F. 667, 104 C.C.A. 649, 31 L.R.A.(N.S.) 270; 16 R.C.L. 909, § 416. Rent is not a debt or liability in the generally accepted meaning of those terms, while it has yet to accrue. There is no obligation to pay until the rent is due according to the terms of the lease. Rent to be paid in the future is not a debt or liability for the recovery of which a present action will lie. The duty to pay rent may never arise by the happening of events which by the laws of property relieve a tenant from payment. Because the obligation to pay rent may never arise, it is regarded as contingent and not an absolute liability. * * *" 200 Minn. at 482, 483, 274 N.W. at 640.
In State ex rel. Thomson v. Giessel, 267 Wis. 331, 65 N.W.2d 529 (1954) the state, *294 having financed an office building through a loan from a state fund and desiring to build an addition, leased the existing building and site to the State Public Building Corporation. The corporation then issued its notes in an amount sufficient to refund the first loan and to provide money for building the addition, constructed the addition and leased the enlarged building back to the state. The land lease was for 50 years and the lease-back for 34 years. Rental was to be paid during the construction period and thereafter the monthly rental was to consist of the amounts due for principal of and interest on the notes of the corporation. The court said:
"While in one sense any contract to pay money in the future creates a debt, state and municipal governments might be unable to function except under severe handicap if all such contracts were held to create debts within the meaning of constitutional and statutory prohibitions relating to governmental indebtedness."
* * * * * *
"Historically the common-law principles governing the landlord-tenant relationship did not recognize future rent as a presently existing debt or liability. See 1 Tiffany Landlord and Tenant, p. 1010, sec. 166. As Tiffany points out, although there be a lease, which may result in a claim for rent, which will constitute a debt, yet no debt occurs until enjoyment of the land has been had. `The obligation to pay rent is contingent upon the lessee's continued enjoyment of the land, * * *'"
* * * * * *
"We deem that the legislature would have the power to authorize the state to enter into leases for office space to house state agencies performing the governmental functions of the state without contravening any constitutional prohibition against state indebtedness. * * *"
In 405 Monroe Co. v. City of Asbury Park, 40 N.J. 457, 193 A.2d 115 (1963), the Supreme Court overruled a lower court judgment holding invalid the lease of a parking garage to the city on a "net rent" basis for a long-term period. As in this case, all taxes, assessments and insurance premiums were to be paid by the city. At the end of the lease term, title was to vest in the city for a consideration of $1.00. In spite of the fact that the lease provided that in the case of damage or destruction the rentals would not be abated, the court found it to be a true lease and not in violation of the constitutional limitation on city indebtedness, nor did it consider significant the fact that the amount of the rentals would equal the full value of the property. The court held that the parties intended a lease transaction and that there was no reason why the city could *295 not proceed in that manner when it was unable to acquire the building at the outset.
The fact that the City Lease was negotiated as a lease by parties represented by counsel and familiar with the technical meaning of the terms they used is enough to persuade the majority from holding that the aggregate of the rent that may eventually fall due during the term of the lease should be totaled and treated as if it were a present indebtedness. 3A Thompson, Real Property § 1290 (1959 Replacement); Tiffany, Real Property § 166 (1912); Heberer v. Board of County Com'rs of Chaffee County, 88 Colo. 159, 293 P. 349 (1930) cases quoted above.[1]
Debt limitation provisions of the type found in the Arizona Constitution stem from an amendment to the Ohio Constitution in 1851. By 1910 their meaning had become definite, and it was well understood that they did not apply to rental arrangements. Debt limitations were almost universally adopted as a reaction to the abuses of railroad financing in the 19th century. Promoters induced communities to issue general obligation bonds, pocketed the proceeds, and if the railroad failed, sold it for junk. The community was left with the bonds to pay, but without the railroad. Arizona had had its experiences with this type of financing in territorial days. See Willson, Railroading on Shoestring, Arizona Days and Ways Section, Arizona Republic, June 19, 1965.
When the Arizona Constitutional Convention met in 1910, the proposed section on Public Debt Revenue and Taxation was given intensive study by a 13 man committee which met twice a week. In opening the debate on the Proposition which was to become Article 9 of the Constitution, Governor Hunt called the attention of the Convention to this work, and told the delegates that the committee had received the views of Tax Commissions from all over the country, as well as those of professors of economics from Harvard to Stanford. These reports have not been preserved, but we do have verbatim reports of the debates of the Convention. Primarily, the convention was interested in the tax provisions but with regard to debt, the Convention was most interested in what had been done in the Western states. The particular problem of this case was not discussed, nor was modern terminology of "general obligation bonds", "revenue bonds" or "lease-back" used, but from the developments before 1910 which their studies must have revealed, it is apparent that the constitutional limitation was intended to apply to general obligation bonds, and that the word "debt" was not used in any broad sense which would include the payment of rent.
In City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. *296 341 (1898) the United States Supreme Court had authoritatively held that debt limitations of the type included in the Arizona Constitution did not include service contracts or rent due under leases such as the City Lease involved in this case. The court said:
"But we think the weight of authority, as well as of reason, favors the more liberal construction, that a municipal corporation may contract for a supply of water or gas, or a like necessary, and may stipulate for the payment of an annual rental for the gas or water furnished each year, notwithstanding the aggregate of its rentals during the life of the contract may exceed the amount of the indebtedness limited by the charter. There is a distinction between a debt and a contract for a future indebtedness to be incurred, provided the contracting party perform the agreement out of which the debt may arise. There is also a distinction between the latter case and one where an absolute debt is created at once, as by the issue of railway bonds, or for the erection of a public improvement, though such debt be payable in the future by installments. In the one case the indebtedness is not created until the consideration has been furnished; in the other, the debt is created at once, the time of payment being only postponed.
"In the case under consideration the annual rental did not become an indebtedness, within the meaning of the charter, until the water appropriate to that year had been furnished. If the company had failed to furnish it, the rental would not have been payable at all; and, while the original contract provided for the creation of an indebtedness, it was only upon condition that the company performed its own obligation. Wood v. Partridge, 11 Mass. 488, 493. A different construction might be disastrous to the interests of the city, since it is obviously debarred from purchasing or establishing a plant of its own exceeding in value the limited amount, and is forced to contract with some company which is willing to incur the large expense necessary in erecting water works upon the faith of the city paying its annual rentals. Smith v. Dedham, 144 Mass. 177, 10 N.E. 782; Crowder v. Town of Sullivan, 128 Ind. 486, 28 N.E. 94 [13 L.R.A. 647]; Saleno v. City of Neosho, 127 Mo. 627, 30 S.W. 190 [27 L.R.A. 769]; City of Valparaiso v. Gardner, 97 Ind. 1; New Orleans Gaslight Co. v. City of New Orleans, 42 La. Ann. 188, 7 South. 559; Merrill Railway & Lighting Co. v. City of Merrill, 80 Wis. 358, 49 N.W. 965; Weston v. City of Syracuse, 17 N.Y. 110; City of East St. Louis v. East St. *297 Louis Gaslight & Coke Co., 98 Ill. 415; Grant v. City of Davenport, 36 Iowa, 396; Lott v. City of Waycross, 84 Ga. 681, 11 S.E. 558; [Burlington] Water Co. v. Woodward, 49 Iowa, 58." 19 S.Ct. 85.
In the face of this pronouncement by the United States Supreme Court, it is inconceivable that an informed Constitutional Convention would have adopted the type of limitation on debt that it did, if it had had any wish to also impose limitations on rental contracts. This court has already adopted this doctrine. In Wise v. First National Bank of Nogales, 49 Ariz. 146, 65 P.2d 1154 (1937), we quoted with approval from the case of American Co. v. City of Lakeport, 220 Cal. 548, 32 P.2d 622, 626 (1934):
"The rule that the inhibitions of the constitutional debt limit do not apply to contingent obligations has long been settled in this state. In Doland v. Clark, 143 Cal. 176, 76 P. 958, 960, where a city by certain contracts agreed to pay for certain services for five years at a monthly rate, it was held that there was no violation of article 11, § 18, the court saying: `It is evident that they (the contracts) did not create any liability at the time they were executed, except a contingent future liability. * * * The amounts to become due on completion of the contracts by appellant might never become a liability upon the city. A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens. * * * There may be ample funds to pay the rental when it accrues, as provided in the contracts, if it ever should accrue.' * * *"
Furthermore, leasing of public buildings as an alternative to the issuance of bonds and construction by other units, had been authorized by Congress for the territories, after it had imposed limitations on their indebtedness. The present 4% limitation comes from this legislation. The leading decision describing and upholding this system was rendered by the territorial court of Oklahoma, Giles v. Dennison, 15 Okl. 55, 78 P. 174 (1904), but the legislation discussed was also applicable to Arizona.
Furthermore, the delegates to the Constitutional Convention were familiar with the Constitution and decisions of California. Much of early Arizona law was taken from California, and the California Constitutional provision, Calif.Const.Art. 11, Sec. 18 is identical in intent to the Arizona provision. As early as 1896 the California Supreme Court adopted the view that an annual payment for sewer collection services was not a debt in McBean v. City of Fresno, 112 Cal. 159, 44 P. 358, 360, 31 L.R.A. 794. The court said:
"In a certain very restricted sense it may be said that a liability is created *298 by a contract such as this; but to call it a present liability for the aggregate amount of the payments in the contract contemplated thereafter to be made is not legally permissible. A liability to the city would arise upon breach of contract, but the constitution never meant to protect the city from the consequences of its own willful and tortious acts. A liability might arise against the city for the negligence of its officers, and the damages due to an individual who had suffered therefrom might be great; but such liability for a municipal wrong the constitution never meant to protect against. When it is [sic] come to consider the contractual relations between the city and appellant, it is at once seen that the city cannot be liable in any one year for more than $4,900, an amount far within the revenue derived to the sewer fund, and, further that it cannot become liable for this amount at all until faithful service rendered by the contractor each year. * * *"
This principle was applied to a rental contract in Doland v. Clark, 143 Cal. 176, 76 P. 958 (1904). Recently, in the leading case of Dean v. Kuchel, 35 Cal.2d 444, 218 P.2d 521 (1950) the California court has reaffirmed these views in a case involving a plan for financing a municipal improvement similar in detail to that proposed for the Phoenix Civic Auditorium. This plan included a ground lease, constructed by a corporation, a lease-back on a net lease, and vesting of title to the improvements in the state on the termination of the ground lease.
Courts throughout the country have approved financing plans basically similar to that now before us in many cases in which the objection that they violated debt limitations were raised. These cases include both lease-backs and leases, with both non-profit corporations, private parties and public authorities. Among the leading cases are:

Arkansas : McArthur v. Smallwood, 225 Ark. 328, 281 S.W.2d 428
 (1955).
California : Dean v. Kuchel, 35 Cal.2d 444, 218 P.2d 521 (1950); City
 of La Habra v. Pellerin, 216 Cal. App.2d 99, 30 Cal.
 Rptr. 752 (1964); City of Los Angeles v. Offner,
 19 Cal.2d 483, 122 P.2d 14, 145 A.L.R. 1358 (1942).
Colorado : Heberer v. Board of County Com'rs of Chaffee County,
 88 Colo. 159, 293 P. 349 (1930).
Georgia : Sheffield v. State School Bldg. Authority, 208 Ga. 575,
 68 S.E.2d 590 (1952).
Illinois : Berger v. Howlett, 25 Ill.2d 128, 182 N.E.2d 673 (1962);
 Loomis v. Keehn, 400 Ill. 337, 80 N.E.2d 368 (1948).
*299 Indiana : Protsman v. Jefferson-Craig Consolidated School Corp.
 of Switzerland County, 231 Ind. 527, 109 N.E.2d 889
 (1953); Book v. State Office Building Commission, 238
 Ind. 120, 149 N.E.2d 273 (1958).
Kansas : State ex rel. Fatzer v. Armory Board, 174 Kan. 369, 256
 P.2d 143 (1953).
Kentucky : Fiscal Court of Jackson County v. Board of Education of
 Jackson County, 268 Ky. 336, 104 S.W.2d 1103 (1937),
 aff. 269 Ky. 258, 106 S.W.2d 990.
Michigan : Walinske v. Detroit-Wayne Joint Bldg. Authority, 325
 Mich. 562, 39 N.W.2d 73 (1949).
Minnesota : Ambrozich v. City of Eveleth, 200 Minn. 473, 274 N.W.
 635, 112 A.L.R. 269 (1937).
Missouri : Petition of Board of Public Buildings, (Supreme Court
 of Missouri), 363 S.W.2d 598 (1962).
New Jersey : 405 Monroe Co. v. City of Asbury Park, 40 N.J. 457, 193
 A.2d 115 (1963).
Oklahoma : Application of Oklahoma Capitol Improvement Authority
 (Supreme Court of Oklahoma), 355 P.2d 1028 (1960).
Pennsylvania : Kelley v. Earle, 325 Pa. 337, 190 A. 140 (1937); Greenhalgh
 v. Woolworth, 361 Pa. 543, 64 A.2d 659 (1949).
Utah : Bair v. Layton City Corporation, 6 Utah 2d 138, 307 P.2d
 895 (1957). (sewer system contract)
Wisconsin : State ex rel. Thomson v. Giessel, 267 Wis. 331, 65 N.W.2d
 529 (1954); State ex rel. Thomson v. Giessel, 271 Wis. 15,
 72 N.W.2d 577 (1955).

One detail of the lease before us deserves special attention. Section 7.1 provides that in the event of default defendant may take possession of the property, re-lease for the account of the City, and the City would be unconditionally liable for any deficiency. This provision is susceptible to the construction that the City is undertaking a general obligation as guarantor, in addition to its obligations as a tenant.
If this construction is correct, the theory upon which rent is distinguished from debt may be violated since the City may have eliminated some of the contingencies in which it might be excused from payment of rent if it does not occupy the building. The lease provides for the release of the City and the protection of defendant through insurance in the event of physical disaster, but this clause raises the problem of what *300 will happen in the case of economic disaster.
I know of no case where there has been a default in a public lease-back transaction, and hesitate to construe the clause in a declaratory judgment action, where there are no facts relating to a default and no legal authorities presently available. I have found no discussion of any similar clause in a public lease, even though such clauses are common in commercial leases. In Haggerty, supra, the California Court of Appeals was faced with the construction of a lease provision which it thought violated the Rule Against Perpetuities. There the rule of construction governing the Rule Against Perpetuities is that if under any conceivable set of facts the rule might possibly be violated, the lease must be held invalid. Here we do not have that situation. If, in the unknown future, defendant should assert a claim against the City which would be a claim for a debt barred by the constitutional provision limiting the City debts all that would happen would be that defendant would not collect. I cannot say that in all events and in all possible circumstances Section 7.1 would be enforceable against the City in accordance with its apparent meaning.
I do not endorse the contention that Phoenix cannot do indirectly what it cannot do directly. To do so would mean that Phoenix could never have an auditorium and would outlaw needed public improvements of all kinds throughout the state. The correct rule was stated in Kelley v. Earle, 325 Pa. 337, 190 A. 140, 147 (1937):
"* * * The fact that the proposed plan might be termed an evasion of the Constitution would not condemn it unless such evasion was illegal. `It is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it.' Tranter v. Allegheny County Authority, supra, 316 Pa. 65, at page 84, 173 A. 289, 297. The bonds of the Authority are to be paid out of its revenues. The credit of the State is not pledged or bargained away."
The provisions of Section 7.1 go beyond the bounds of a legal method. An unconditional guarantee of rent to be paid by another, contained in an otherwise valid lease, partakes of the nature of a general obligation, even though there is no way to determine its amount. Having construed the debt provision of the constitution as limiting general obligations, it is immaterial whether the provision creating a general obligation appears in a bond or a lease.
An advantage of the Declaratory Judgment procedure is that the parties may renegotiate *301 their lease in the light of the opinion of the court and the project may then go forward without delay. This procedure was used in Haggerty, supra, and I would apply it to this case.[2]
To avoid confusion I should also point out that, if an act of the legislature had authorized the lease provision we have condemned the remoteness of the contingency in which it would be operative, and the presumption of validity that attaches to the acts of a coordinate branch of the government, might have led me to withhold condemnation. Courts do not look for a remote possibility arising in the future where there would be a violation of debt limitation provisions of state constitutions. Banner v. City of Laramie, 74 Wyo. 429, 289 P.2d 922; Wicks v. Salt Lake City, 60 Utah 265, 208 P. 538. The presumption of validity which attaches to acts of the legislature does not apply, at least with full force, to the ordinances or leases of municipal bodies. Note, City Government in the State Courts, 78 Harv.L.Rev. 1596 (June 1965).
Judgment should be affirmed in accordance with this dissent.
NOTES
[1] ARTICLE VII. Section 7.1. If the City should, after notice, fail to remedy any default (a) in the payment of any sum due under this City Lease for fifteen (15) days, or (b) in the keeping of any other term, covenant or condition herein with all reasonable dispatch, not exceeding thirty (30) days or such additional time as is reasonably required to correct any such default after notice by the City to the Company properly specifying wherein the Company has failed to perform any such obligation, then the Company shall have the right, at its option, without any further demand or notice (i) to terminate this City Lease, and to re-enter the demised premises and eject all parties in possession thereof therefrom, and may use all necessary force so to do, or (ii) to re-enter the demised premises and eject all parties therefrom, using all necessary force so to do and without terminating this City Lease relet the demised premises, or any part thereof as the agent and for the account of the City, upon such terms and conditions as the Company may deem advisable, in which event the rents received on such reletting shall be applied first to the expenses of reletting and collection, including necessary renovation and alteration of the demised premises, a reasonable attorney's fee, and any real estate commissions actually paid and thereafter toward payment of all sums due or to become due to the Company hereunder, and if a sufficient sum shall not be thus realized to pay such sums and other charges, the City shall pay the Company monthly any deficiency and the Company may bring an action therefor as such monthly deficiency shall arise.

The foregoing remedies of the Company are in addition to and not exclusive of any other remedy of the Company. Any such re-entry shall be allowed by the City without let or hindrance, and the Company shall not be liable in damages for any such re-entry or guilty of trespass.
[2] ARTICLE VIII. Section 8.1. Except as is otherwise provided in Section 9.4 hereof, the City agrees that upon the expiration of this City Lease it shall surrender to the Company the demised premises, together with any improvements thereon, in good order and condition and in a state of repair that is consistent with prudent use and conscientious maintenance except for reasonable wear and tear.

ARTICLE IX. Section 9.3. The parties hereto mutually covenant and agree that the City, by keeping and performing the covenants and agreements herein contained, shall at all times during the Term, peaceably and quietly, have, hold and enjoy the demised premises, without suit, trouble or hindrance from the Company.
ARTICLE IX. Section 9.4. Upon expiration of this City Lease, and in consideration of the timely payment of all rental payments provided for herein, and provided that the City has performed all the covenants and agreements required by the City to be performed, the Ground Lease and the Term granted by it shall cease and expire and the Company shall cause the Trustee under the Indenture to release any interest which the Trustee may have in the demised premises from the lien of the Indenture.
ARTICLE IX. Section 9.5. In any event, and notwithstanding any other provisions of this City Lease, and regardless of any act or failure to act on the part of any party hereto, or the failure of the City to make any payment contemplated herein, at the expiration of the Ground Lease, all rights of the Company or any other person or entity except the City in and to the demised premises shall cease.
[3] Article IX, Section 8, Arizona Constitution:

"Local Debt Limits; Assent of Taxpayers "Section 8. No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding four per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of a majority of the property taxpayers, who must also in all respects be qualified electors, therein voting at an election provided by law to be held for that purpose, the value of the taxable property therein to be ascertained by the last assessment for State and county purposes, previous to incurring such indebtedness; except, that in incorporated cities and towns assessments shall be taken from the last assessment for city or town purposes; Provided, that under no circumstances shall any county or school district become indebted to an amount exceeding ten per centum of such taxable property, as shown by the last assessment roll thereof; and Provided further, that any incorporated city or town, with such assent, may be allowed to become indebted to a larger amount, but not exceeding fifteen per centum additional, for supplying such city or town with water, artificial light, or sewers, when the works for supplying such water, light, or sewers are or shall be owned and controlled by the municipality. As amended, election Nov. 5, 1912, eff. Dec. 5, 1912."
[4] A.R.S. § 42-303.

"D. No expenditures shall be made for a purpose not included in such budget, and no expenditure shall be made, nor debt, obligation or liability incurred or created in any fiscal year in excess of the amount specified for each purpose in the budget for such fiscal year as finally adopted except when authorized under and pursuant to the provisions of § 42-308, whether or not the county, city or town has at any time received, or has on hand, funds or revenue in excess of those required to meet expenditures, debts, obligations, and liabilities incurred under such budget. As amended Laws 1956, Ch. 84, § 2."
[5] The dissenting opinion clearly shows why the majority opinion in the Dean case was based on a strained construction of the facts.

"In my opinion, even the most liberal construction of the contract which this court is asked to approve shows that the transaction is a subterfuge and therefore void within the rule applied in City of Los Angeles v. Offner, 19 Cal.2d 483, 122 P.2d 14, 145 A.L.R. 1358 * * *
* * * * *
"The rule plainly stated and applied in these decisions is that in contracts of this type an option to purchase must be something sold for a consideration other than the so-called `rentals'. The contract now before the court does not include or even purport to contain an option to purchase and a fortiori it is but a disguished [sic] installment sale agreement." 35 Cal.2d at 449 and 453, 218 P.2d at 524 and 526.
[1] And cases collected in Note, 103 A.L.R. 1160 (1936).
[2] In an opinion addressed to the Director of the Department of Budget and Finance dated March 8, 1965, the Attorney General of Hawaii, in discussing the possibilities of adopting lease-back financing under the constitutional debt limitation provisions of Hawaii, suggested the omission of default provisions similar to Section 7.1 from the leases. He suggested:

"Omission of any provision for survival of liability for the payment of rent or any provision for liability for damages upon the termination of the lease for nonpayment of rent. The Authority should be given only possessory remedies for default in the performance of the lessee's obligations."